## HENRY NAPOLEON BUNEL and F. S. HEFFER-
NAN, Appellants, v. NESTER et al.

### Division One, April 11, 1907.

1. **RESULTING TRUSTS: Statute of Frauds: Evidence.** Implied
   trusts, whether they be such as are designated in the books
   as resulting trusts or those called constructive trusts, are taken
   out of the provisions of the Statute of Frauds. The proof of
   the existence of such trusts rests in parol.

2. **————: Curator: Deed of Trust: Taking Title in Himself: Spec-
   ulation on Ward's Money: Recital in Trustee's Deed.** A senior
   deed of trust on two pieces of property secured a loan thereon
   made by Mills and one made by the curator out of his ward's

funds; a junior deed of trust on the same property secured the curator's individual loan as well as one made by him for his ward. *Held,* that there was no principle of natural equity or written law that denied to the curator the privilege of bidding at the foreclosure sale in his own right, to protect himself as well as the ward and Mills. If he bid more than the ward's debt, and treated the purchase as his own and accounted to the ward for her loan, by charging himself in gross for all money coming into his hands originally as the curator of her estate, and there is absent any increment of gain to him by way of speculation on his ward's money in the purchase of the property, a narrative in the trustee's deed to him that he paid the purchase price is presumptively true, and he did not take the property in trust for the ward. *And this conclusion is fortified by the fact that in his final settlement the curator treats the loans made out of his ward's estate as if paid to him and as left in the corpus of the trust estate.*

3.  ————: **Proof: Statement by Curator.** Disconnected parts of poorly remembered conversations between the deceased curator and the debtor whereby the curator is made to say on the date of the trustee's sale of the mortgaged property that he was bidding for his ward, are not sufficient to show that he took title for his ward—the rule being that where plaintiff relies for title on raising an implied trust, the proof should be so clear, unequivocal, cogent and impelling as to exclude every reasonable doubt from the chancellor's mind.

4.  ————: ————: **This Case.** Giving force to the rule as to the character of proof required to establish an implied trust in property, and attending to the fact that both the trustee who sold the mortgaged property to the curator and the curator are dead, that the curator was solvent and possessed of large means and handled large sums, that the transaction in question was never questioned in his lifetime, that he treated the property purchased at the trustee's sale as his own and specifically disposed of it by will, and that the property was not specifically described in the ward's deed to plaintiffs, while other parcels of real estate were so described therein, it should be held that the proof was not sufficient to show that the curator bought the property at the trustee's sale for his ward.

5.  ————: **Ward's Estate: Interest.** Under some circumstances interest should be charged to the curator on the money of his ward. But where the suit is to have a trust declared in her favor in property sold to him under a deed of trust given in part to secure a loan of her money and in part to secure a loan of his, and no claim is made that accrued interest was used towards paying a part of the purchase price, the pleadings are not in shape to authorize a consideration of the question.

Appeal from Greene Circuit Court.—*Hon. James T. Neville,* Judge.

AFFIRMED.

*Barclay, Shields & Fauntleroy* and *F. S. Heffernan* for appellants.

(1) Under the evidence the guardian and curator, and his heirs receiving the property from him, are undoubtedly liable in equity to his ward   A constructive trust or a resulting trust is immediately created by the conversion of the guardian, and he and his heirs hold the property as trustees for the true owner.   Huttman v. Viesselman, 48 Mo. App. 582; Douschroeder v. Thias, 51 Mo. 100; Kelley v. Johnson, 28 Mo. 249; Miller v. Davis, 50 Mo. 572; Plumb v. Cooper, 121 Mo. 668; Boyd v. Mammoth Spring Co., 137 Mo. 482; Paul v. Chouteau, 14 Mo. 580; Shaw v. Shaw, 86 Mo. 594; In re Ferguson Estate, 124 Mo. 574.   (2) Under the circumstances there was a constructive trust created by the facts in equity, by which John O'Day was bound to account, for the property in his hands, to plaintiff. The property used by O'Day was originally the property of Henry N. Bunel.   It was decreed out of him by a fraudulent decree of the New York Court.   When that decree was set aside by the United States Circuit Court on the ground that it was fraudulently obtained and admitted by many to be so obtained by fraud, *eo instanti,* H. N. Bunel's rights to the fund in O'Day's hands were restored and O'Day held the fund for him as an equitable trust, and when he converted the property sued for, to his own use, he became liable to account to the real owner.   Patterson v. Booth, 103 Mo. 402; Green Tree Brewing Co. v. Dold, 45 Mo. App. 603; Gamble v. Gibson, 59 Mo. 585; Monroe v. Collins, 95 Mo. 33; 1 Perry on Trusts (3 Ed.), sec. 27; Bircher v. St. Louis Metal Co., 77 Mo. App. 500; State ex rel. v.

Elliott, 157 Mo. 609; Burford v. Aldridge, 165 Mo. 419; Bircher v. Walther, 163 Mo. 461; Pearson v. Haydell, 90 Mo. App. 253; Clark v. Bank, 57 Mo. App. 277; Harrison v. Murphy, 106 Mo. App. 465; Heil v. Heil, 184 Mo. 665; Garrett v. Garrett, 171 Mo. 155; Lincoln Trust Co. v. Wolff, 91 Mo. App. 133; State ex rel. v. Berger, 92 Mo. App. 631; Crawford v. Jones, 163 Mo. 577; Farrell v. Farrell, 91 Mo. App. 665; Mayer v. Bank, 86 Mo. App. 422; Meystedt v. Madden, 86 Mo. App. 178; Davis v. Hoffman, 167 Mo. 573; Keet v. Gideon, 80 Mo. App. 609; Nuggles v. Callison, 143 Mo. 527. (3) (a) The fact that John O'Day received said property as guardian of Mary Earles Kee, she having been fraudulently adjudged to be an heir of Charles E. Bunel, did not justify said O'Day in robbing the estate of his said ward, by converting it to his own use, and when said fraudulent adjudication was admitted by his ward, and decreed to be fraudulent by the United States Circuit Court, the equitable title to all the property and its income and profits in the hands of John O'Day as such guardian, was held by him for the benefit of Henry Napoleon Bunel, and he was bound to account to Bunel for any property belonging to said funds converted by him to his own use. Patterson v. Booth, 103 Mo. 402; Gamble v. Gibson, 59 Mo. 585; Evangelical Synod of N. A. v. Schoenich, 43 Mo. 652; McGuire v. Nugent, 103 Mo. 161; Thorpe v. McPike, 62 Mo. 300; Norton v. Irwin, 43 Mo. 153; Bispham's Principles of Equity, p. 92; Perry on Trusts (2 Ed.), sec. 429; Hill on Trusts (3 Ed.), 160; Baldwin v. Dalton, 168 Mo. 20; Phillips v. Overfield, 100 Mo. 466; Monroe v. Collins, 95 Mo. 33. (b) The fraudulent conversions by O'Day being shown, the true owner can follow the fund into the property held by his heirs. Patterson v. Booth, 103 Mo. 402; Roach v. Coraffa, 85 Col. 436; Bremell v. Adams, 146 Mo. 70. (4) (a) The conveyance by Mary Earles Kee to Henry N. Bunel

of all her right, title and interest in and to all the money, property or effects due her from the estate of John O'Day, deceased, her former guardian and curator, being money and property that the said John O'Day had received as her guardian and curator, and all the interests and profits arising therefrom to said Henry Napoleon Bunel, giving the said Henry Napoleon Bunel the same right to sue for the same that she had, and also all the money, notes, bonds and evidence of the debt due and held in trust for her by the New York Life Insurance and Trust Company of New York City in the State of New York, was not a mere assignment of the naked right to sue for fraud, but was based on valuable considerations. (b) The settlement was of disputed and litigated claims between them which is always a good consideration. (c) The deed was a restoration to the rightful owner, as far as in her power lay, of the property in O'Day's hands which had been fraudulently adjudged to Mary Earles by the New York court as the result of a fraudulent conspiracy. This is of itself a good consideration and canot be held to be the assignment of a mere naked right to sue for fraudulent conversion. Smith v. Wade, 43 Mo. 557; Jones v. Babcock, 15 Mo. App. 149; Lionberger v. Baker, 14 Mo. App. 353; Page v. Gardner, 20 Mo. 507; Johnson Co. v. Bryson, 27 Mo. App. 341; Conn. Mut. Life Co. v. Smith, 117 Mo. 261; Goodger v. Finn, 10 Mo. App. 226; Dickson v. Merchants Elevator Co., 44 Mo. App. 498; Smith v. Harris, 43 Mo. 557; Wilson v. Railroad, 120 Mo. 45; O'Day v. Meadows & O'Day, 194 Mo. 617. (5) Where a trustee mixes trust money with his own so that it cannot be distinguished what particular part is trust money and what part is private money, equity will follow the trust money by taking out what is due the *cestui que trust.* Harrison v. Smith, 83 Mo. 210; Staller v. Coats, 88 Mo. 514;

Evangelical Syn. of N. A. v. Schoeneich, 143 Mo. 652; Pundman v. Schoeneich, 144 Mo. 149; Tierman's Ex. v. Security B. & L. Assn., 152 Mo. 135; Flint Roar Cart Co. v. Stephens, 32 Mo. App. 341; Bircher v. Walther, 163 Mo. 461; Leonard v. Latimer, 67 Mo. App. 138; Bircher v. Sheet Metal Co., 77 Mo. 509; Bank v. Brightwood, 148 Mo. 367; Snoregrass v. Moore, 30 Mo. App. 232; Clark v. Bank, 57 Mo. App. 281; Bank v. Sanford, 62 Mo. App. 394; Brick Co. v. Schoeneich, 65 Mo. App. 283; Leonard v. Latimer, 67 Mo. App. 138; Peck v. Elliott, 30 Kan. 156; Thompson v. Bank, 8 Atl. 97; Plow Co. v. Lamp, 45 N. W. 104; Phelps v. Overfield, 100 Mo. 466; Meystedt v. Grace, 86 Mo. App. 178; 144 Mo. 149; 143 Mo. 664; 83 Mo. 210. (6) Any omission or concealment that wrongs the estate must be considered fraudulent without any reference to the motive that dictates it. Clyce v. Anderson, Ex'r, 49 Mo. 37; Smiley v. Smiley, 80 Mo. 44; Byerly v. Donlin, 73 Mo. 270; West v. Revis, 13 Ind. 294; Hook v. Payne, 14 Wall. (U. S.) 252. (7) The trust will attach to the property which is the product and substitute for the original thing, as it can be traced. Phillips v. Overfield, 100 Mo. 466; Patterson v. Booth, 103 Mo. 402; Parker v. Straat, 39 Mo. App. 616; Butler v. Lawson, 72 Mo. 227; Brief, 117 Mo. 284; Oliver v. Piatt, 3 How. (U. S.) 333; Bispham's Equity Jurisprudence (4 Ed.), sec. 86; 1 Perry on Trusts (2 Ed.), pp. 515, 518; 2 Pomeroy on Equity Jurisprudence (1 Ed.), p. 626.

*Delaney & Delaney* with *E. W. Banister* for respondents.

(1) The bill does not state facts sufficient to entitle complainants to the equitable relief prayed for or to any equitable relief whatever. (2) It will be seen from the allegations of the bill that complainants seek to recover on the theory that John O'Day used the money of his ward, Mary, in paying for the land and

that he purchased the property in fact for her, but took the title in his own name. To establish a trust on the theory that the money actually used in buying the property in question was trust money, the evidence, to warrant a decree, must be so clear, definite and positive as to leave no reasonable ground for doubt. Johnson v. Quarles, 46 Mo. 423; Forrester v. Scoville, 51 Mo. 268; Jackson v. Wood, 88 Mo. 76; Philpot v. Penn, 91 Mo. 38; Rodgers v. Rodgers, 87 Mo. 257; Shaw v. Shaw, 86 Mo. 594; Kennedy v. Kennedy, 57 Mo. 73; Philips v. Overfield, 100 Mo. 466; Adams v. Burns, 96 Mo. 361; Burdett v. May, 100 Mo. 13; King v. Isley, 116 Mo. 155; Dailey v. Dailey, 125 Mo. 96; Buck v. Ashbrook, 59 Mo. 200; Ferris v. Van Vechten, 73 N. Y. 13; Oliver v. Platt, 3 How. 333; Story's Eq. Jur., secs. 1258; Shepherd v. McEvers, 4 Johns. Ch. 136; Dodge v. Manning, 1 N. Y. 298. "The principle to be deduced" is "that where the trust fund has consisted of money and been mingled with other moneys of the trustee in one mass, undivided and undistinguishable, and the trustee has made investments generally from moneys in his possession, the *cestui que trust* cannot claim a specific lien upon the property or funds constituting the investments." Hill on Trustees, 522; Moses v. Margatroget, 1 Johns. Ch. 119; Kip v. Bank, 10 Johns. 63; 2 Kent's Com., 623, 624; Trevothick v. Austin, 4 Mason 29; Falkland v. Nat. Bk., 84 N. Y. 145; 2 Pom., Eq. Jur., 623n; Atty.-Gen. v. Ins. Co., 82 N. Y. 193; Cavin v. Gleason, 105 N. Y. 263; Ward v. Higgins, 9 N. Y. 645. (3) When plaintiffs are contending that a resulting trust arose because O'Day used the purchase money of his ward in payment of the real estate purchased, surely this court will not declare a constructive trust and render judgment that O'Day had no right at all to buy. Capen v. Garrison, 193 Mo. 335; Woods v. Boots, 60 Mo. 546; Wendleton v. O'Brien, 68 Mo. App. 675. (4) The right of a *cestui que trust* to set aside a sale for fraud

practiced by the trustee, or to have one declared a trustee who purchases property with trust funds, is not assignable. There is nothing in plaintiff's bill or in the evidence in this case which exempts the transaction between Mary and Henry from the operation of this well-established rule. Jones v. Babcock, 15 Mo. App. 149; McMahon v. Allen, 34 Barb. 56; Smith v. Harris, 43 Mo. 557; French v. Shotwell, 5 Johns. Ch. 555; Upton v. Bassett, Cro. Eliz. 445; Story's Eq., sec. 1040; Morrison v. Deaderick, 10 Humph. 342; Whitney v. Kelly, 94 Cal. (29 Pac. 624); Sanborn v. Doe, 92 Cal. (28 Pac. 105); Dickerson v. Seoun, 44 Mich. 631; Milwaukee v. Railroad, 20 Wis. 163; Carrol v. Potter, Walk. Ch. 355; Wilson v. Railroad, 120 Mo. 45; Haseltine v. Smith, 154 Mo. 404; Hayward v. Smith, 187 Mo. 464; French v. Shotwell, 20 Johns. Ch. 668; Shufelt v. Shufelt, 9 Paige Ch. 144; Graham v. Railroad, 102 U. S. 148; Dayton v. Fargo, 45 Mich. 153; 3 Pom. Eq. Jur., 386; Crocker v. Bellangee, 6 Wis. 645. (5) Even if Henry Bunel, on the evidence, had a prior original right to the funds and property, and even if the assignment was taken to remove an obstacle to the assertion of such right, and even if the bill declares on the original right, still the bill must be dismissed because the alleged assignment passes nothing. It does not describe the property involved in this suit nor does it attempt to describe it. It does not refer to O'Day or to his acts in connection with this property. There are no operative words sufficient to pass any interest in realty. The language used is too vague and general to pass a right to sue for fraud in a particular transaction. The word property is used in the restrictive sense of money, bonds, etc. McKinney v. Settles, 31 Mo. 541; Smith v. Hutchinson, 61 Mo. 87; Webb v. Mullins, 78 Ala. 111; People v. Railroad, 84 N. Y. 565; Chicago v. Hulburt, 118 Ill. 633; Bridges v. Taylor, 102

N. C. 86; Bancroft v. Curtis, 108 Mass. 50; Brailey v. Southborough, 6 Cush. 140.

LAMM, J.—Plaintiffs filed a bill in equity in the Greene Circuit Court to fasten a trust in their favor on certain real estate in the city of Springfield, Missouri (occupied by defendant, Nester, as tenant), devised by the will of John O'Day, Sr., to certain other defendants, viz: Sue I. Baldwin O'Day, his widow, and his minor children, Catherine, John Baldwin and Thomas K. O'Day, alleging that the other defendants claim some interest—the real estate to be impressed with the trust being described as follows: "A part of lot ten, block two, original plat of Springfield, Missouri, commencing at the southeast corner of said lot ten, thence north on west side of Boonville street twenty-two feet, west 117½ feet, thence south twenty-two feet to north line of Olive street, east along north line of said Olive street to Boonville street, the place of beginning. Known as the 'Mint Saloon Building.' "

At hearing, *nisi*, plaintiffs' evidence being in, defendants demurred. Their demurrer was sustained and plaintiffs appeal.

A student of the law (Mr. Moore) in Law Notes for March, 1907, p. 225, has written with felicity and judgment on Improbabilities — his data gathered by picking and choosing from the *dicta* of judges. He points out that CADWALADER, J., in Snyder v. Ins. Co., 22 Fed. Cas. 741, says: "The most improbable things are sometimes true, and the most probable things sometimes don't happen;" and that SAVAGE, J., in Shepard v. Railroad (Me.), 65 Atl. 20, says: "It is true, in human experience, that almost all things are possible." It is Byron (was it not?) who philosophizes thus: "Truth is always strange, stranger than fiction," which is but a paraphrase on the chimney-corner adage that —Truth is stranger than fiction. The French have a saw running in this wise: It is always the impossible

that happens, shaded off in everyday use by variation into: The unexpected always happens.

The miserable story of this case may bear such foreword, inasmuch as its dark incidents lie well within the borders of an evil wonderland. While the home-spun names of some of the actors have a tang of cabin and native soil, other names carry the memory of the scholar back to the guillotine, the Reign of Terror, and to the spell of the traditions of the First Napoleon— the threads of that story stretching from France to the pine woods of northern Arkansas. The case is this:

Damas Napoleon Bunel, once (as we infer) a resi-dent of the United States, died in France a citizen of that Republic on December 31, 1887, intestate, leaving one child and the descendants of another and an immense estate, partly in France and partly in the hands of the New York Life Insur-ance and Trust Company, as trustee, in the city of New York. It seems that fourteen years prior to his death, and again in 1876, he executed to said trust company certain instruments placing in its hands a large amount of property in trust (said to be of a value of $500,000). The trustee had power to collect and receive the in-come and dividends of the trust estate, and, during the life of Damas Napoleon Bunel, apply the same to his use. On his dying, the trust estate was to be di-vided into two equal parts and administered as follows: One part to be kept invested and the income and profits thereof paid over to the daughter of Damas Napoleon Bunel, Marie Antoinette Alker. She, dying, her moiety was to be turned over to her children "per stirpes, share and share alike." The other moiety was to be kept invested and the income and profits thereof ap-plied to the use of the son of Damas Napoleon Bunel, to-wit, Charles Emile Bunel. Upon the death of Charles Emile, said trustee was to pay over and trans-fer this moiety to the child or children of him, the said

Charles Emile, *"per stirpes,* share and share alike."

Marie Antoinette Alker and her husband Napoleon A. Alker resided in France. What ill wind blew Charles Emile Bunel far from home and kindred into the hill country of northern Arkansas, we know not; but in 1872 he was there, apparently living in penury and want, and there married.one Nancy J. Petty on the. 20th day of June of that year — the record showing that thereafter "the said Charles Emile Bunel and his wife Nancy lived in obscurity and indigence in different places in Arkansas and Missouri." In 1878 a son was born to Charles Emile Bunel and Nancy, his wife —the child being named Henry Napoleon Bunel, and he is one of the plaintiffs in this case. To poverty and obscurity was soon added the pinching shoe of marital infelicity and Nancy tired of and left the bed and board of Charles Emile. Later this couple drifted into Ozark county, Missouri, and there on April 28, 1884, Charles Emile brought suit against his spouse for divorce, alleging the following grounds: "That for more than six years last past, defendant has willfully and without just cause abandoned the bed of plaintiff, and refused to cohabit with plaintiff, as his wife; that defendant unmindful of the duties of a faithful wife, and the affection of plaintiff for her, on or about the — day of January, 1884, committed adultery with a man to plaintiff unknown. That the defendant is now pregnant by said person. That plaintiff has not had knowledge of defendant's person for about six years; that defendant has at divers times and places committed adultery with other men whose names and which times and places of said acts of adultery are unknown to plaintiff." On personal service, on the 9th day of June, 1884, Nancy appeared and answered, admitting her marriage but averring herself chaste. At a trial on the same day, the court heard the proofs, found the allegations of the petition true and granted a divorce

to Charles Emile Bunel. Four months thereafter a child was born to Nancy, a girl, who was named Mary and who figures in this record as "Mollie Earles," "Mary Earles," "Marie Bunel," "Mary Earles Kee," "Mary Bunel Earles Kee," and as "Mary Earles Mc-Kee." It seems that one Alfred Earles resided with Charles Emile and Nancy Bunel before their separation, and continued to live at Nancy's habitation thereafter; and in 1887 this twain were married. From data before us it would seem that, in spite of the untoward facts just laid bare, at least from January 1, 1888, to January 1, 1894, Nancy Earles was a pensioner on the Bunel estate in France to the amount of $500 per annum. Charles Emile Bunel died on the 28th day of December, 1886, and in one year thereafter Damas Napoleon Bunel died. It seems on the death of the latter that ancillary administration was taken out in the city of New York by Frederic R. Coudert, Charles Coudert and Paul Fuller on his estate there situate. That in the spring of 1887 Marie Antoinette Alker and two of her sons came to southern Missouri, found Henry Napoleon Bunel and took him, then a child of nine years, to France, where, barring subsequent visits to this country, he has ever since resided as a citizen. In the Republic of France, one Napoleon Alker, a son of Marie Antoinette, was appointed guardian and curator of Henry Napoleon Bunel, caring for and educated him until his majority; and, having had charge of that portion of his grandfather's estate belonging to him in France, turned over to him $140,000 of his inheritance. Presently Napoleon Alker, by virtue of his French curatorship, applied to the New York Life Ins. & Trust Co. for the moiety of the estate held in trust for his ward's father, Charles Emile Bunel. Thereupon said trust company declined to pay over to such curator the whole of said moiety but, holding a trust estate to be paid over to the "child or *children*" of Charles Emile

Bunel, it demanded proof of Henry Napoleon Bunel's sole heirship. Thereupon a suit was instituted by the trustee in the Supreme Court of the city of New York, having for its object the determination of that matter. The defendants in that suit were the aforesaid ancillary administrators, Marie Antoinette Alker, Henry Napoleon Bunel and Mary Earles—the latter being impleaded as Mary Earles, but pleading as "Marie Bunel." As we understand it, due service was had in that case. Henry Napoleon Bunel was represented by a guardian *ad litem;* and we infer Mary Earles, or Marie Bunel, was also so represented—the question at issue being the legitimacy of Mary. Was she the daughter of Charles Emile Bunel, and, therefore, entitled to inherit with Henry Napoleon? Or was she born out of wedlock, the child of Nancy Bunel and the said Henry Earles and therefore only the uterine sister of Henry Napoleon? Proofs were taken and, following them, a judgment entered in the Supreme Court of the city of New York finding the girl, Mary, a legitimate child, and the full sister of Henry Napoleon, and she was decreed co-heir with him in the estate of Charles Emile. Prior to the aforesaid judgment, one Horine was appointed by the probate court of Greene county, Missouri, guardian of the person and curator of the estate of the girl, at that time passing as Marie Bunel. Subsequently one Hansell became her guardian and curator; and we infer he was so acting when the judgment of the Supreme Court of the city of New York was rendered in December, 1893. Thereafter Hansell resigned, and one Frank P. Clements was appointed by the probate court of Greene county her guardian and curator. He in turn resigned, and John O'Day, Sr., took office as guardian and curator by due appointment, giving a bond as such in the sum of $150,000, and receiving from said Clements the portion of his ward's estate then in Clement's hands—the part so received being

made up of payments to Clements from the New York trustee after the aforesaid judgment in the Supreme Court of the city of New York establishing the legitimacy and heirship of Marie Bunel, and amounting to cash, $3,816.65, notes $8,700. It seems that Mr. O'Day made a trip to Yoetot, France, and there ascertained that Napoleon Alker of that place had a large estate in his hands belonging to Marie, this on the theory she was co-heir with Henry Napoleon. Subsequently armed with an exemplification of the New York judgment and with an order of the probate court of Greene county directing him to at once proceed to Yoetot, France, and take the necessary steps to collect his ward's estate and empowering him to settle and compound the claims of his ward and to execute an acquittance and discharge therefor, etc., and further armed with a certificate that he was the guardian and curator of Marie Bunel, under a bond of $150,000 for the faithful discharge of his duty, Mr. O'Day made a second trip to France and by proceedings in the French courts, gained possession of something like $55,000 belonging to his ward — the same being her share of the estate of her putative grandfather, Damas Napoleon Bunel, in France, and in process of administration there — and brought said sum within the jurisdiction of the probate court of Greene county. Thereafter Mr. O'Day received further sums from the New York trustee, as dividends due Marie Bunel. He made six settlements with the probate court; the first in February, 1896; the second in February, 1897; the third in March, 1898; the fourth in February, 1899; the fifth in March, 1900; and on September 18, 1900, he resigned his trust, presumably having given notice required by Revised Statutes 1899, sec. 3529, and made his final settlement and was discharged — he and the defendant John O'Day, Jr., having been appointed joint curators and receipting to

John O'Day, Sr., for the estate left in his hands. The facts charged in plaintiffs' bill and upon which relief is sought are connected with the curatorship of John O'Day, Sr., prior to his said resignation and final settlement; therefore, these settlements will receive more particular attention further on.

It may be said that John O'Day, Sr., died testate on the 31st day of July, 1901; and that the scene now shifts to the United States Circuit Court for the Southern Division of the Western District of Missouri, sitting at Springfield. In that court, prior to the death of John O'Day, Sr., to-wit, in 1901, Henry Napoleon Bunel, as a citizen of France, lodged a bill in equity against John O'Day, Jr., and John O'Day, Sr., as curators of the estate of Mary Earles Kee, and Mary Earles Kee and Henry Kee, her husband, for the purpose of vesting the apparent title of Mary Earles Kee in and to the trust estate in the hands of said curators out of her and into Henry Napoleon Bunel. John O'Day, Sr., was not served in that case. Subsequently, and after the death of John O'Day, Sr., an amended bill was filed against John O'Day, Jr., as sole curator, and Mary Earles Kee and her husband. It seems that Marie Bunel (or Mary Earles) had married a man named Henry Kee (or McKee), and by said amended bill the facts hereinbefore set down were pleaded; and it was further alleged that Mary Earles Kee was not the child of Charles Emile Bunel, but of said Alfred Earles, *i. e.*, was no grandchild of Damas Napoleon Bunel; that when the father and grandfather of Henry Napoleon Bunel died, and he, a lad, was taken to France, it became noised abroad in Ozark county that, as the son of Charles Emile Bunel, he was heir to a great estate in France and New York City; that (using metaphor by way of illumination) as certain *carnivora* scent their prey up the wind, the possibilities of the case invited a simulated claim, even as where the car-

cass is, there the eagles are gathered together. Accordingly, one R., a deputy United States marshal, conceived the notion of making money by the bold stroke of claiming that Mary Earles was also an heir to the Bunel estate and entitled to one-fourth thereof. To that end R. employed K., an attorney at law, to bring suit to establish by a decree of court that Charles Emile Bunel was the father of Mary Earles; that Nancy and Henry Earles being poor, K. agreed to pay all costs and procure the evidence to establish Mary's legitimacy, and Nancy Earles agreed to give him one-half of the sum recovered (See Kersey v. O'Day, 173 Mo. 560); that K. and R. thereupon entered into a compact between themselves to procure the necessary evidence and establish such fact, at the time well knowing Mary was a bastard child. To that end the bill alleges they procured perjured testimony tending to show that Charles Emile Bunel was about his wife and had access to her in the months of January, February and March, 1884; that as a device furthering their scheme they caused the little girl, Mary (a Protestant child) to be baptized into the Roman Catholic church by a priest under the name of Marie Bunel, by representing to said priest she was the child of Charles Emile Bunel, a Roman Catholic; that they fraudulently procured from the probate court of Greene county the appointment of Horine as guardian and curator of Marie Bunel; that when issue was joined in the New York suit, the Supreme Court of that State appointed a commissioner, one W., to take testimony; that said court appointed one L. B. to act as guardian *ad litem* of Henry Napoleon Bunel, then about fourteen years old, and said guardian *ad litem* sent a young attorney, R., to Missouri to attend the taking of testimony, who betrayed the trust reposed in him and conspired with K., becoming K.'s servant and tool in procuring suborned witnesses as aforesaid; that the evidence so procured

was perjured; that the pleadings in the Supreme Court of New York, alleging that Mary Earles was a child of Charles Emile Bunel, were false; that said conspirators suppressed competent and known proofs establishing the illegitimacy of Mary; that witnesses at hand who knew the facts and informed said conspirators of their knowledge were not called to testify; that others were persuaded to leave the State, and that a reputable physician who knew that Charles Emile Bunel was impotent for more than eighteen months before the birth of Mary Earles and who was willing to depose to such material fact, was not called to depose; that because of such suppression of testimony and such bribed witnesses falsely swearing to facts having no existence, the Supreme Court of New York was induced to give an iniquitous decree in favor of Mary Earles in which it falsely appears that Charles Emile Bunel was her father; that all said evil things were done and said decree procured in order that said conspirators K. and R. might share the gains ill-gotten from such venture, and that they did receive $30,000 of the plunder, all of which was paid out of Henry Napoleon Bunel's estate. It was further alleged that Henry Napoleon was not represented in said suit by any attorney who wanted he should win his case; and that as soon as he learned the frauds perpetrated on him, by a cablegram he instructed the plaintiff, Heffernan, to bring suit to recover the property wrongfully taken from him by said New York judgment. The bill further alleges that John O'Day, Jr., is the sole curator of the minor defendant Mary; that said curator had on hands $25,000 in money and notes; that other large amounts of such trust fund were invested in real estate; that she and said John O'Day, Jr., are in possession of said real estate. Many tracts of land are then set forth and described as affected by said trust, but the tract in suit is not one of them. The prayer

of the bill was that the chancellor should determine that the money, notes and real estate aforesaid are the property of Henry Napoleon Bunel; that John O'Day, Jr., as curator, should be decreed to turn the same over to plaintiff; and that a writ of restitution issue for the possession of said real estate, and for general relief.

To the foregoing bill of complaint Alfred Earles made oath that he had heard the complaint read and knew that Mary, the wife of Henry Kee, is not a child of Charles Emile Bunel, but is the child of affiant. To the same effect was the affidavit of Nancy J. Earles. She deposed that she was the mother of plaintiff, Henry Napoleon Bunel, and the mother of Mary Earles Kee, the defendant; that the allegation that Alfred Earles is the father of Mary is true; that witnesses whose testimony was material to establish the fact that Henry Napoleon was the only child begotten of her marriage with Charles Emile Bunel were paid or in some way induced not to give their testimony to that effect, while other witnesses were induced to falsely swear to a set of given matters falsely showing that Charles Emile Bunel was the father of Mary.

On October 16, 1902, Mary Kee, signing herself, Mary Bunel Earles Kee, made answer to said bill of complaint. By that answer she admitted she was the child of Nancy and Alfred Earles, who were lawfully married after her birth. She remembers that as a child she was called "Mollie Earles," and avers that she always knew that Alfred Earles was her father. She admitted in detail the allegations of the complaint charging the wicked practices set forth therein leading up to the concoction of a fraudulent judgment establishing her legitimacy, though she qualified this by saying that she was but nine years old at the time and had no knowledge of the wrong being done her half-brother. She says: "On yesterday I attained my ma-

jority, eighteen years old, which under the laws of
this, my native State, entitled me to act for myself.
And being now of lawful age, I take this, my earliest
opportunity, to restore to the plaintiff, my dear and
affectionate half-brother, his property, and in every
way in my power to right the wrongs done him by the
designing conspirators who imposed upon the said
Supreme Court of the city and county of New York,
the false, fraudulent and perjured testimony tending to
show that I was the daughter of Charles Emile Bunel
and Nancy Petty, impleaded in some places as Nancy
J. Petty." Following this, by name, date and detail,
she admits, *seriatim,* each and every of the charges
in the petition, including her mother's shame; admits
that John O'Day, her former curator, purchased with
trust funds in his hands as her curator the specific par-
cels of real estate described in the bill of complaint;
admits that the plaintiff Henry Napoleon Bunel is the
only heir born of the marriage of Charles Emile Bunel
and Nancy Petty; and the final paragraph of her an-
swer is as follows: "Now, that I have attained my
age of eighteen years, I am willing to right the wrongs
done plaintiff as aforesaid, this court entering a decree
based upon the aforesaid facts, stated in the plaintiff's
bill of complaint, and admitted by me to be true; and
I consent that a decree *pro forma* be entered, giving to
the plaintiff the title to all the above-described real
estate and all the money, bonds, notes, and all other
personal property now in possession of John O'Day,
Jr., my curator." This answer was verified by the
affidavit of Mary.

It was asserted *ore tenus* by counsel, and may be
seen by inference in the case, that the foregoing con-
cessions by way of admission were a part of a compro-
mise of the litigation in the Federal court, in which at
least a $10,000 deposit (to become Mary's) figured.
It seems that subsequently Mary Earles Kee made ap-

plication to withdraw her said answer, and asked leave to file further answer and cross-bill, which pleading was tendered with the application. This application was denied, and it is asserted that evidence was taken upon which that denial was predicated. Whereupon, a decree was entered, in effect, *pro confesso* that the personal property of whatever kind and description in the possession or control of John O'Day, Jr., curator of the estate of Mary Earles Kee at the time of the institution of this suit, and since coming into his possession and under his control, was and is held in trust for the use and benefit of Henry Napoleon Bunel, and said Henry Napoleon is entitled to have an accounting with said curator; and, further, that the right, title and interest in and to said personal property is divested out of her and vested into Henry Napoleon; and that all the right, title and interest of the defendant Mary in and to the fund described in the bill of complaint held in trust for her by the New York Life Insurance and Trust Co., in law and equity belonged to Henry Napoleon, and the same is divested out of the said Mary and into him. John O'Day, Jr., was perpetually enjoined from paying over any of said funds in his hands to Mary, and it is set forth that the real estate described in the bill has been adjusted by mutual conveyances and is not affected by the decree—costs were adjudged against Mary, and the cause continued for further proceedings in the matter of the accounting between Henry Napoleon and John O'Day, Jr.

It is asserted that the foregoing decree was appealed from by Mary Earles Kee and by John O'Day, Jr., and a settlement made pending such appeal, but such facts do not appear in this record.

On the same day of Mary's answer to the amended bill in the Federal court, and of her making affidavit to the same, to-wit, October 16, 1902, she executed a quitclaim deed to Henry Napoleon Bunel in consider-

ation of one dollar.  By this deed she conveyed sundry tracts of land in Greene county to Henry Napoleon by specific description; but the tract in suit is not one of those described.  If that tract was conveyed, or in any wise affected by that deed, as a deed, it was under the following clause of the conveyance:

"I hereby assign, transfer all my rights, title, interest and estate in and to all the money, property, or effects due me from the estate of John D'Day deceased, my former guardian and curator; being money and property that the said John O'Day, now deceased, received as my guardian and curator, or as my curator, and all the interest and profits arising therefrom, to the said Henry Napoleon Bunel, giving the said Henry Napoleon Bunel the same right to sue for the same that I have.  Also all the money, notes, bonds and evidence of the debt due and held in trust for me by the New York Life Insurance and Trust Company of New York City, in the State of New York."

Following Mary's deed to Henry (and on the same day) he executed a warranty deed for an expressed consideration of one dollar to the plaintiff, F. S. Heffernan, his attorney in the litigation in the Federal court, specifically conveying the property in dispute, with other property, and further assigning and transferring to Mr. Heffernan all his right, title and interest in and to all the money or property "due from the estate of John O'Day, deceased," the former guardian and curator of Mary Bunel Earles, giving said Heffernan the same right the grantor had to sue for said property or trust fund in any court of law or equity.

Some time thereafter, at a date not fixed by the record, Mr. Heffernan made an examination of the record and it was shown by his oral testimony, over the objection of defendants, that he had made a reconveyance to Henry Napoleon of a half interest in the prop-

erty conveyed and rights transferred to him. His explanation of this reconveyance was as follows: "After making an examination of the records of the probate court, I ascertained that the liabilities due from the estate of John O'Day, deceased, would be much larger than I had first supposed, and I reassigned to Henry N. Bunel one-half of the property he had conveyed to me." Mr. Heffernan was allowed to testify that he sent this conveyance to Henry Napoleon Bunel at Gates Station in Greene county, where he was living with his mother; that shortly thereafter, "his stepfather told me he received it." The witness further testified that presently Bunel came into his office and admitted receiving it, and that he swore he received it in the Federal court; that Bunel was in Paris the last the witness heard of him.

The trial of the case at bar was in November, 1903, and Mr. Heffernan testified that Henry Napoleon left the State of Missouri in "February last," with the understanding that he would be back before the first day of April. There was no record of the conveyance from Heffernan to Henry Napoleon; and on the above state of proof, over the objection of defendants and exception saved, Mr. Heffernan was permitted to give secondary evidence of the contents of this unrecorded deed, presumably in the possession of his co-plaintiff.

Based on the theory that plaintiffs were entitled to an undivided half each in the property in suit, plaintiffs (as said) lodged a bill in equity in the circuit court of Greene county against the defendants. This bill was subsequently amended, and as amended, in substance, pleads that John O'Day was the guardian and curator of the estate of Mary Earles, alias Mary Bunel; that there came into his hands as such guardian and curator $90,000 of money belonging to Mary, then a minor; that on the 7th day of September, 1896, said guardian and curator loaned $10,000 of such funds to Pattie D.

McElhaney and took the note of said McElhaney therefor in his name as guardian and curator, and at the same time, to secure said loan, took from Pattie D. and her husband a deed of trust on the Mint Saloon building, being the property heretofore described; that on the 2nd day of February, 1898, said deed of trust was foreclosed and the property sold at public vendue and bid in by said O'Day for his ward, but that O'Day took the title through a trustee's deed in his own name; that the money used for the said purchase of said property was Mary's, and that O'Day held the legal title thereto up to the time of his death; that when he died in July, 1901, leaving a will, he devised said property to his widow and certain of the defendants, and the legal title now rests in said devisees—defendant Nester being a tenant under them; that the monthly rental of said property was $100, which defendants had collected since August, 1901. The bill proceeds to set forth that Henry Napoleon Bunel brought a suit in equity in the United States Circuit court at Springfield wherein he contended that Mary Earles was only his uterine sister; that in said suit Mary contended she was his full sister; that Henry contended that all the property and trust fund in the possession of O'Day as guardian and curator of Mary were his property as only heir at law of Charles Emile Bunel, deceased; that the object of said suit in the United States Circuit Court was to have the property in the possession and control of the guardian and curator of Mary decreed to be his property; that the Mint Saloon was a part of the property to be affected; that during the pendency of that suit Mary reached her majority, and, by way of a settlement, admitted by answer she was only the uterine sister of Henry, and that, in consideration of a compromise, Mary conveyed and assigned all the trust property to Henry, including the property sued for, and Henry conveyed said property back to Mary for her

use and benefit during her natural life. Mary's deed of October 16, 1902, to Henry is pleaded; and it is averred that by said deed she assigned and transferred and duly conveyed said property (the Mint Saloon) and all rights and rents due therefrom to Henry, and Henry on the same day made a like conveyance and assignment to his co-plaintiff, Heffernan; and Heffernan, in November, 1902, assigned and transferred an undivided half interest in the Mint Saloon back to his co-plaintiff, Henry; and that the two are now, in equity and good conscience, entitled to said property. Wherefore, they pray an accounting of the rents, that the title of said real estate be vested out of defendants and into plaintiffs, that a writ of restitution issue, and for costs and for such other orders, judgments, and decrees as a court of equity may find right and just.

To this amended bill, defendants demurred, generally and specially, and, their demurrer being overruled, they answered, admitting that John O'Day was the guardian and curator of Mary and that defendants are the devisees of said O'Day, but they deny all other allegations, and specifically deny that the Mint Saloon was purchased with the money of Mary Earles. Defendants then, by way of further defense, allege that the conveyance of Mary Earles to plaintiffs was procured by fraud and misrepresentation; that the suit in the Federal court, referred to by plaintiff, is still pending in the Supreme Court of the United States; and that Mary Earles is now claiming that said alleged settlement was procured by fraud. Defendants say that Mary Earles should be made a party hereto.

The last paragraph of the answer, charging fraud in the assignment and settlement, and the pendency of the suit in the Supreme Court of the United States, was struck out on motion, leaving the answer stand on the general issue modified by the specific admissions aforesaid.

To sustain the allegations of the bill, the settlements of John O'Day, Sr., as curator of Mary were put in evidence. It seems Mr. O'Day was a man of large means and died leaving a very large estate. It does not appear that he kept a bank account as a curator; and the case is presented to us on the theory the ward's funds were commingled with his own. It does appear that he loaned a great deal of his ward's money; and notes, deeds of trust, sales thereunder, and conveyances pertaining to the same, disconnected from the matter in hand, were introduced in evidence, on the theory of plaintiff's learned counsel that they tended to show a misuse of funds in those specific instances—thereby showing (they argue) that his system of dealing with the trust estate indicated a disposition to speculate off of the beneficiary. But these transactions are not developed sufficiently to show a general plan of exploiting the trust and being wholly disconnected from the subject-matter of the suit, we consider them of no value and they are put to one side. The curatorship seems to have been a stormy one, full of incidents and litigation; and divers attorneys were employed from time to time by Mr. O'Day to protect his ward's interests, and heavy expense was entailed. One of these attorneys, it was said *ore tenus*, and as indicated by the final settlement, was Mr. Heffernan, one of the plaintiffs in this case. It was said, and not denied, that he prepared the final settlement of Mr. O'Day as curator. It seems that in the annual settlements errors of bookkeeping crept in, subsequently discovered and corrected; also that in some of these settlements Mr. O'Day distinguished between cash on hand and money loaned out and took a credit for such loans in his accounts. In other settlements he treated the loans made by him as curator as cash on hand and charged himself in gross. In some instances loans were foreclosed and the property bought in the name

of his ward. In such instances the facts appear in the settlements and a credit is taken by the curator for the amount of money invested in real estate by purchase in the ward's name and foreclosure. In the view we take of this case, it will not be necessary to set forth these settlements, because there is no attempt made here to impeach the final settlement, and set aside the order approving the same. As said, the case was argued to us on the theory one of the plaintiffs, Mr. Heffernan, made that settlement; and therein the plan was adopted of going back over the history of the curatorship and charging Mr. O'Day with the money coming into his hands as curator, and taking a credit for summarized disbursements shown by the annual settlements and approved by the probate court. That settlement is as follows:

*In the Probate Court of Greene County, Missouri.*

John O'Day, guardian and curator of the estate of Mary Bunel, submits the following account current for final settlement in said estate:

First settlement to inventory
from former curator .....$14,508 83
Interest collected on Dorsey
note ...... .. .... ......        20 93
By cash disbursed ..... ..                  $ 2,902 78
Second settlement, to cash
from France .... ....... 54,545 00
To interest received .. .. 1,975 00
By cash disbursed ..... ..                    7,700 75
Third settlement, to interest
collected .... .. ......... 3,796 15
By cash disbursed ..... ..                    2,472 11
Fourth settlement to interest
received ...... .. ....... 2,669 40
By cash disbursed ..... ..                    4,054 03

| | | |
|---|---|---|
| Fifth settlement, to interest collected .... .. .. .. ...... | 2,803 31 | |
| By cash disbursed ...... .. | | 22,044 40 |

### *Final Settlement.*

| | |
|---|---|
| March, 1900. By cash allowance Nancy Earles .. ... | 40 00 |
| March 8. By cash, H. M. Heckart, for work .. .. ... | 20 00 |
| March 12. By cash, ward .. | 5 00 |
| March 12. By cash, court cost | 13 75 |
| March 14. By cash, Mat. Sims, abstract supreme court ...... .... ...... . | 675 60 |
| March 20. By cash F. S. Heffernan, attorney, making settlement of case in supreme court .. .. ...... | $ 2,000 00 |
| April 1. By cash, Nancy Earles, allowance .. ...... | 40 00 |
| April 4. By cash, Reps Dry Goods Co. ...... .... .. | 13 75 |
| April 10. By cash, back tax . | 128 35 |
| April 10. By cash, back tax .. | 71 95 |
| April 10. By cash, back tax .. | 62 74 |
| April 10. By cash, back tax .. | 37 05 |
| April 10. By cash, back tax .. | 35 15 |
| April 16. By cash, Jas. Y. Milner, rent .... .. ...... | 250 00 |
| May 3. By cash, Nancy Earles, allowance .... .. .... .. | 40 00 |
| May 16. By cash, Mary Bunel Kee, ward .... .. .... . | 200 00 |
| June 2. By cash, Towns & Dean, painting for ward .. | 8 35 |
| June 6. By cash, John O'Day, Jr., mdse. for ward .. .. | 15 52 |

Bunel and Heffernan v. Nester.

| | | |
|---|---:|---:|
| June 6. By cash, Nancy Earles, allowance ............. | 40 | 00 |
| June 23. By cash, Mary Bunel | 150 | 00 |
| June 27. By cash, Mary Bunel | 100 | 00 |
| July 1. By cash, Nancy Earles, allowance ............. | 40 | 00 |
| July 19. By cash, to John O'-Day, mdse. for ward ..... | 81 | 60 |
| Aug. 1. By cash, Nancy Earles, allowance ......... | 40 | 00 |
| Aug. 25. By cash, Davis Planing Mill Co., for repairs .. | 40 | 00 |
| Aug. 27. By cash, Mary Bunel Kee, ward ........... | 25 | 00 |
| Aug. 31. By cash, Perry Buchanan, repairs ........... | 3 | 50 |
| Sept. 1. By cash, Nancy Earles, allowance ............. | 40 | 00 |
| Sept. 13. By cash, Mary Bunel Kee, ward ............. | 25 | 00 |
| Sept. 15. By cash, attorney fee for this settlement ......... | 100 | 00 |
| Sept. 15. By cash, court costs to date ............... | 10 | 65 |
| Sept. 15. By cash, real estate taken under deeds of trust, etc. ............... | 15,932 | 00 |
| To interest collected from New York ...............$ 815 49 | | |
| To interest from F. S. Heffernan ............... 250 00 | | |
| To rents collected .. ........ 176 00 | | |
| | $81,560 | 11 |

Bunel and Heffernan v. Nester.

| | | |
|---|---:|---:|
| Disbursements .............. | $59,458 85 | |
| By allowance defending all suits against the estate and case of management for five and one-half years ......... . | 1,500 00 | |
| By spending money for ward . | 5 00 | |
| April 3, 1900. By cash, J. L. Stewart, in full account .. | 42 40 | |
| By cash, Error, Mat. Sims account ................... | 1 80 | |
| By cash, notice of final settlement .................. | 2 50 | |
| By cash, tax 1899 .......... | 352 51 | |
| By cash, A. C. Cowden, attorney for ward in examining all settlements ...... | 200 00 | |
| By cash, to ward this date .... | 100 00 | |
| By cash, O. H. Travers, attorney for ............ | 400 00 | |
| By cash, Additional costs ... . | 1 80 | |
| | $81,560 11 | $62,077 36 |
| Balance due estate, bonds, notes and cash ............... | | $19,482 75 |

It is agreed on all sides that the item in the foregoing settlement, to wit, "By cash, real estate taken under deeds of trust, etc., $15,932," did not include the Mint Saloon, but did cover real estate purchased in the name of his ward at foreclosure. Plaintiffs' equities, if any, arise out of a McElhaney loan, the facts pertaining to which will presently appear with particularity. It is further agreed on all hands that $10,000 of the ward's estate were loaned to the McElhaneys. It is contended by defendants' learned counsel that O'Day charged himself in the foregoing final settlement with the body of the McElhaney loan. Plaintiffs' learned counsel say *contra*. Their position is

that O'Day "never accounted to his ward for the conversion of this fund." We find the facts to be that the body of the McElhaney loan is charged to O'Day in the foregoing final settlement—appearing therein in the bulk charges made against himself of the original moneys coming into his hands as curator. Furthermore, as shown by one of his annual settlements, he collected certain interest on the McElhaney loan; and that interest is charged to him and appears in the final settlement under the head of, "To interest received." It was shown that the foregoing final settlement of John O'Day was examined, filed and approved on the 18th day of September, 1903, by the probate court of Greene county, and that on the day of the approval of that settlement John O'Day, Jr., and John O'Day, Sr., as curators of the estate of Mary Bunel Kee, receipted to John O'Day, Sr., for the balance due his ward as found by that final settlement, and John O'Day, Sr., as individual curator, stood discharged.

Attending to the McElhaney loan, it appears that on the 7th day of September, 1896, John O'Day, Sr., as curator of Mary Bunel, loaned Pattie D. McElhaney $8,500 and took her notes to himself as the guardian and curator of Mary for said sum, due in three years, with interest payable semi-annually. At that very time Mrs. McElhaney was indebted to one Mills in the sum of $765, evidenced by a note. As we understand it, it was necessary to protect the Mills note in order to perfect the title to the property, securing the loan; accordingly, the Mills' paper was secured by the same deed of trust securing the loan. This deed of trust was to E. C. O'Day, trustee, was in ordinary form, with power of sale, and conveyed two pieces of property in Springfield — one, known as the First National Bank building, and lot, is the subject-matter of another suit; the other, known as the Mint Saloon, is the subject-matter of this suit. Subsequently, on the 27th day of

October, 1896, John O'Day, Sr., as curator for Mary, loaned to the McElhaneys, husband and wife, $1,500 more of his ward's money. At that very time the Mc-Elhaneys were indebted to him individually in sums evidenced by notes said to aggregate $5,000. Thereupon, to secure the new advance of $1,500 from his ward's funds, and to secure his own individual indebtedness, the McElhaneys executed a deed of trust in ordinary form to E. C. O'Day, trustee, covering the same property, to-wit, the First National Bank building and the Mint Saloon. The note evidencing the new advance was taken in the name of O'Day as curator, and ran for two years, with eight per cent interest payable semi-annually.

Because of the default made "in the payment of taxes, insurance and interest," the deed of trust bearing the date of September 8, 1896, was foreclosed by advertisement by E. C. O'Day as trustee on the 8th day of February, 1898—eighteen months after its execution. At that sale John O'Day, Sr., purchased both the properties conveyed by the deed of trust at a gross sum of $14,600, and received a trustee's deed therefor to himself individually, in which it is narrated that said sum was paid to the trustee by the purchaser. It will be seen that the deed of trust foreclosed secured $8,500 of Mary's funds and also the Mills note; and it will be seen, further, that here was a surplus (over both the debts) created by this sale, subject to be applied on indebtedness secured by the second deed of trust and sufficient to wipe out the $1,500 of the ward's money secured thereby, and leaving a further surplus to be applied on the individual indebtedness of John O'Day, also so secured.

By oral testimony from R. L. McElhaney, the husband of Pattie D., and a son, Homer L., who attended the sale, it was shown that the First National Bank building brought $6,600 and the Mint Saloon $8,000.

The elder McElhaney testified he was endeavoring to stop the sale; that John O'Day assured him the property would bring more than the deed of trust, and that he (O'Day) would bid it up; that it made no difference if it sold for $100,000 he (O'Day) would pay the McElhaneys the difference between what it was worth and what was borrowed on it. Witness said he did not remember all the conversation, but O'Day said he would buy the property for his ward—he was bidding on it for his ward. It was shown that O'Day had never paid over any surplus to the McElhaneys; that they had tried to have a settlement with him, but that he was sick and pleaded for time. By the son, Homer L., it was shown that O'Day assured his father at the sale that he was buying the property in to protect his ward, Mary Bunel, and further assured his father he would protect Mrs. McElhaney in her interest; and that if the property did not bring what they thought was an equitable value for it, he (O'Day) would bid it in for his ward—that he was bidding it in for his ward.

It was shown that John O'Day was not a party to the decree in the Federal court. Alive when the suit was brought, he was not served, and when he died pending the suit, it was not revived against his heirs or representatives. There is not an allegation or a particle of proof connecting him in any way with the frauds leading up to the New York judgment; nor was he a party to that proceeding. There was no evidence tending to show that the Mint Saloon building and the First National Bank building were bought in by O'Day at a speculative value—*contra,* the indications are that full value was paid for both. There is no evidence there was any surplus at that sale over and above the McElhaney obligations, the Mills note and the secured individual indebtedness of John O'Day. The two McElhaney notes were put in evidence—one for $8,500, the other for $1,500; and indorsed across the face of

each was the following: "Paid by sale under deed of trust." Who put that indorsement on these notes was not shown, nor does the record show from whose custody these notes came. Mr. Mills was placed on the stand, and by him it was shown that the trustee paid him nothing, but that John O'Day, Sr., had permitted him to collect the rents on the Mint Saloon for a time to apply on his (Mills') debt; and that he had collected and applied the sum of $592, leaving a balance unpaid. It was admitted at the trial that E. C. O'Day was dead, and the will of John O'Day, Sr., devising the Mint Saloon property to defendant Catherine and her children was introduced.

Such was plaintiffs' case; and on the foregoing record it is insisted there was either a resulting or a constructive trust arising from the facts in proof in favor of Mary Earles; that the devisees in John O'Day's will held subject to that trust and were seized of the property to the use of Mary Earles; that when the circuit court of the United States decreed the funds in the hands of O'Day to belong to Henry Napoleon, and when Mary admitted that to be so and executed her deed to Henry, the beneficial interest in the property passed to Henry and then passed to his coplaintiff, Heffernan, under his deed, that an undivided half interest passed back to Henry by Heffernan's unrecorded deed, and that the chancellor erred in sustaining the demurrer to the evidence and dismissing the bill.

Did the chancellor err? We think not. Because:

Implied trusts, whether they be such as are designated in the books as resulting trusts or those called constructive trusts, were early taken out of the provisions of the Statute of Frauds and Perjuries, to-wit, the statute "For the Prevention of Frauds and Perjuries" (Vol. 1 Laws of Mo. 1825, p. 403). And such is now the written law. [R. S. 1899, sec. 3417.] That is,

the proof of the existence of such trusts rests in parol. "Resulting or presumptive trusts," says Bouvier (2 Bouv., Tit. Resulting Trusts), "being those which are implied or presumed from the supposed intention of the parties and the nature of the transaction; constructive trusts, such as are raised independently of any such intention, and which are forced on the conscience of the trustee by equitable construction and the operation of law." A familiar example of a resulting trust is where A purchases real estate with the money of B (A and B being strangers) and takes the title in his own name. In such case a resulting trust arises in favor of B—the trust being "raised by the law from the presumed intention of the parties, and the natural equity that one who furnishes the means for the acquisition of the property should enjoy its benefit." Where a part only of the purchase money is furnished by the beneficiary, the trust is for a proportionate share of the land bought. [Stevenson v. Smith, 189 Mo. l. c. 466; *In re* Ferguson's Estate, 124 Mo. l. c. 582.]

An analysis of plaintiffs' amended bill shows it to be somewhat framed on the theory of a resulting trust, as distinguished from that class of implied trusts known as constructive trusts. The bill charges in so many words: "That the funds and the money used for the purchase of said property was the money of said Mary, held by the said O'Day, as such guardian and curator of said Mary." Plaintiffs' learned counsel argue there was a trust raised by the facts in proof, that technically it was either a resulting or constructive trust, it was immaterial which, and that under the averments of their bill they should recover on either theory. In the view we take of the matter it will not be necessary to let the case ride off on a mere refined application of the rules of pleading. Both plaintiffs and defendants are in equity, the facts are here, and the thing to do is to get at the equity of the case.

At the very threshold it must be evident that plaintiffs' equities, if any, must stand or fall on the proposition that the trust fund in the hands of John O'Day was used in the purchase of the Mint Saloon property. If it was so used, then it might be necessary to consider contentions made by defendants and denied by plaintiffs, to-wit, that, whatever the rights of Mary, those rights were not a vendible commodity—and hence were not transferred to Henry Napoleon Bunel; and that if they could be transferred to Henry, they could not be transferred by him to the plaintiff, Heffernan, or be kept alive or revived by the conveyance of Heffernan of a half interest back to Bunel.

Present the proof that O'Day accounted for the body of the McElhaney loan by charging himself in gross with the whole estate coming into his hands originally, as here, and absent the proof that there was any increment of gain by way of speculation in the purchase of the Mint Saloon property, as here, then we have nothing to do with collateral matters on other property transactions lugged into the case and claimed to show a uniform and general scheme of exploiting the trust estate. This controversy is between plaintiffs, on one side, and the widow and minor children of John O'Day who set up title to the Mint Saloon building under a devise in his will, on the other; and they may not be deprived of their estate by either innuendo or argument based on transactions of testator pertaining to other properties. If they lose their property, it must be solely because of some proved vice inherent in their title to the property, and because of some settled principle of equity causing them to be seized of the title to the use of plaintiffs. Courts watch the transactions of trustees in handling trust funds with vigilance and solicitude. They may not speculate off the funds held in a fiduciary capacity, nor otherwise employ them to their individual gain. But in this case we find no proof suffi-

cient to sustain plaintiffs' contentions. The situation O'Day was in was peculiar. He was obliged to use diligence to protect the trust fund. Now, the senior deed of trust of the McElhaneys secured a note to one Mills in addition to his ward. The junior deed of trust secured O'Day's debt, as well as the ward's. What principle of natural equity or written law denied to O'Day the privilege to bid at the foreclosure sale in his own right to protect himself as well as the ward and Mills? We know of none. This, under the facts in proof, is precisely what O'Day did. He bid more than the ward's debt. Could it be contended that he could change the character of the trust fund and bid in excess of the ward's debt and charge the ward with the purchase price? This might be so under extraordinary circumstances appealing to the chancellor as the exercise of a wise discretion; but no such circumstances are shown to exist. The thing O'Day did was to treat the purchase as his own and to account to the ward for the loan; and in such circumstances and under the existing proof, we cannot say he speculated off of his ward in this instance, or used his ward's money in the purchase. The narration in the trustee's deed that O'Day paid the purchase price to the trustee is presumptively true. The fact that the McElhaney notes were marked "paid by sale under deed of trust" does not indicate that the ward's money was used in the purchase. If that indorsement was put on by O'Day or by the trustee, unexplained, it tends to show that the money to pay these notes had been realized by the sale and the notes had been paid by the proceeds of the sale. This conclusion is fortified by the fact that in the final settlement he treats the McElhaney notes as if paid to him and as left in the corpus of the trust estate. The disconnected parts of poorly remembered conversations at the day of sale whereby O'Day is made to say that he is bidding for his ward, *etc.,* are not sufficient to

show that he took title for his ward — the rule being that where plaintiff relies for title on raising an implied trust, the proof should be so clear, so unequivocal, so cogent and impelling as to exclude every reasonable doubt from the chancellor's mind.

Giving force to that rule and attending to the fact that the trustee is dead and that Mr. O'Day is dead, that he was solvent and possessed of large means and handling large sums, that this transaction was never questioned in his life, that he treated the Mint Saloon property as his own and disposed of it specifically by will, that the transaction was not questioned in the proceedings in the Federal court and that the property in question is not specifically described in Mary's deed to Henry, while other parcels of real estate were so described, we think the demurrer was properly sustained.

In coming to this conclusion we have not overlooked the fact that the McElhaney foreclosure was based on a default in the payment of interest, as well as default in the payment of taxes and insurance. It is sufficient to say that if some of the interest accruing on the McElhaney loan was not accounted for by O'Day in his final settlement, or if he is to be charged with interest for not keeping the funds loaned out at a legal rate, no such questions are involved in the issues of this case, and, therefore, such questions are reserved as open and not precluded by this litigation. Under some circumstances interest should be charged to a trustee; under other circumstances, not; and neither the pleadings nor the proof here require us to go into that question — there being no offer here by plaintiffs to do equity, to repay to O'Day's estate the amount invested by John O'Day in the property, and no claim that accrued interest was used toward paying a part of the purchase price.

The judgment sustaining the demurrer and dismissing the bill is affirmed.

All concur, except *Woodson, J.,* not sitting.