Lilly Anheuser Suhre, Appellant, v. Adolphus Busch III and August A. Busch, Jr., Executors of the Estate of August A. Busch.—123 S. W. (2d) 8.

Division One, December 20, 1938.

*Buder & Buder* and *G. A. Buder, Jr.,* for appellant.

*Nagel, Kirby, Orrick & Shepley* and *Daniel N. Kirby* for respondents.

FERGUSON, C.—This is an equity suit. There has been some controversy as to its nature, however, plaintiff, appellant here, characterizes it as a suit to establish and enforce a constructive trust and says she does not claim a right of recovery on any other theory. Prior to February, 8, 1928, the plaintiff, Mrs. Lilly Anheuser Suhre, who, before her marriage to William O. Suhre, was Miss Lilly Anheuser, owned 625 shares of stock in Anheuser-Busch, Inc. On February 8, 1928, she transferred the 625 shares of stock to Fred L. Suhre, her husband's brother. Fred L. Suhre sold this stock to Mark C. Steinberg on July 5, 1929, and on January 22, 1930, Steinberg sold the 625 shares to W. Fred Anheuser, a first cousin of plaintiff. Anheuser later transferred the stock to August A. Busch, who was also a first cousin of Anheuser. Anheuser testifies that he sold the 625 shares of stock to Busch February 12, 1930, and defendants' evidence tends to confirm that but plaintiff claims circumstances in the evidence show that in purchasing the shares of stock from Steinberg, on January 22, 1930, Anheuser was acting merely as the agent

of Busch and that Busch was the real purchaser. Busch died February 13, 1934, four years after he acquired these shares of stock. Plaintiff did not assert the claim she herein makes, or any claim or right to the shares of stock, until June 18, 1934, after the death of Busch. On July 3, 1934, plaintiff made a tender to the executors of the August A. Busch estate together with a demand that they deliver to her the said shares of stock, which tender and demand was refused. On July 30, 1934, this suit, against the executors of the estate of August A. Busch, deceased, was commenced in the Circuit Court of the City of St. Louis: The amended petition upon which the cause was tried alleged; "that on the 22nd day of January, 1930, and immediately prior thereto, August A. Busch, since deceased, acting through his agent, servant and representative, W. Fred Anheuser, declared and represented to said Mark C. Steinberg that he was acting in the interest of and for the benefit of the plaintiff, that he wished to acquire said 625 shares of stock for the plaintiff and that in order to protect the plaintiff and prevent her losing the benefit of, and equity in, such valuable property, he desired to repurchase, keep and retain said stock for the plaintiff until she was able to redeem the same; that said Mark C. Steinberg had absolute confidence in the honesty, integrity and good faith of said W. Fred Anheuser and relied upon him to carry out the terms and provisions of the agreement hereinafter mentioned; that said Mark C. Steinberg, induced by the representations aforesaid, agreed to and did sell the said 625 shares of the capital stock of Anheuser-Busch, Inc., to August A. Busch, acting by and through the said W. Fred Anheuser, as aforesaid, upon the condition and with the express understanding and agreement that said stock would be carried for the plaintiff, would be held available for her and would be transferred to her upon the payment of the amount advanced to said Mark C. Steinberg in the acquisition of said stock, and that pursuant to said agreement said Mark C. Steinberg did so sell and deliver said stock for the sum of forty thousand dollars ($40,000.00)." It is then alleged; that since January 22, 1930, there had been paid "as cash dividends on said 625 shares of stock the sum of $4,687.50 and as stock dividends thereon 93¾ shares of the capital stock of The Borden Company;" that the interest "on the said sum of $40,000 from January 22, 1930 to July 3, 1934," the date of tender and demand, was $10,673.33; that on July 3, 1934, plaintiff had tendered the defendant executors $45,985.83, being the principal sum of $40,000 plus $5,985.83, the excess of interest over cash dividends paid, and had demanded "from them the delivery" of the 625 shares and the 93¾ shares of stock of The Borden Company; and that such tender and demand was refused. The prayer is, that the Court "order, direct

and compel the defendants, upon the payment into court by plaintiff of the sum of $45,985.83, to assign, transfer, deliver and convey to the plaintiff 625 shares of the capital stock of Anheuser-Busch, Inc., together with all stock dividends declared thereon since the 22nd day of January, 1930." The answer specifically denied; that Busch acting through Anheuser as his agent made any of the alleged declarations or representations to Steinberg, that Steinberg sold the shares to Busch, that Anheuser in dealing with Steinberg had any authority whatsoever to act on behalf of Busch; that Anheuser purchased the shares for or on account of Busch; or that Anheuser made Steinberg any of the declarations, statements, representations or agreements alleged in the petition. The answer then alleges facts to the effect that Busch was a bona fide purchaser of the stock from Anheuser, that is, that Busch bought said shares from Anheuser in good faith, for value, and without any knowledge that Steinberg or the plaintiff claimed that Anheuser had made any of the alleged statements or representations, and as a further defense pleads laches. The refusal by the defendants of the tender and demand for the delivery of the stock, as alleged in the petition, is admitted. The reply was a general denial of all the averments (except the admissions) of the answer. The trial chancellor found for defendants and entered judgment dismissing plaintiff's bill, from which judgment plaintiffs bring this appeal.

Before setting out the evidence relating to the transaction between Steinberg and Anheuser resulting in the sale of the shares of stock by Steinberg and the transfer of the ownership thereof to Anheuser we state certain introductory facts. We hereafter, as did the witnesses, refer to Anheuser-Busch, Inc., as the brewery. Steinberg was engaged in the brokerage business in the city of St. Louis. At the time of the transaction herein involved Anheuser had been connected with the brewery for about thirty years, had been a director for about fifteen years, owned 1500 shares of brewery stock, and was third vice-president. August A. Busch was president of the brewery. As noted, prior to 1928 plaintiff, Mrs. Suhre, owned these 625 shares of brewery stock. Steinberg testified; that the plaintiff, Mrs. Suhre, had a "stock trading account on our books;" that "the transactions in Mrs. Suhre's account were conducted for her by her husband, William O. Suhre;" that he did not recall "that Mrs. Suhre had any part in it herself;" that he "seldom saw her" but "she may have made one or two visits to our office in five or six years;" that "as a result of losses in the account it became necessary for our firm to call for additional margin" and thereupon the 625 shares of brewery stock were deposited with the Steinberg firm "as additional collateral to secure her stock trading account;" that later Fred Suhre, brother of plaintiff's

husband, "came to the relief Mrs. Suhre and the account was transferred into his name." It appears that at the time Fred Suhre took over plaintiff's account with the Steinberg firm plaintiff assigned and transferred all her title and interest in the said shares of stock to Fred Suhre. The stock ledger of the brewery shows that Fred Suhre became the owner of these shares of stock on February 8, 1928. About the first of July, 1929, Fred Suhre and Steinberg entered into negotiations relative to the purchase of the stock by Steinberg and of date of July 5, 1929, Fred Suhre sold and transferred the 625 shares of stock to Steinberg at the price of $60 per share, a total of $37,500. Certificates covering the 625 shares were issued by the brewery to Steinberg on July 5, 1929, and the stock ledger shows he became owner thereof as of that date. The stock thereafter remained in his name until it was sold and delivered to Anheuser. Steinberg testified, that when he purchased the 625 shares of stock from Fred Suhre plaintiff did not have "any equity in the stock;" that there was no agreement or obligation of any kind assumed or undertaken by him "toward Mrs. Suhre (the plaintiff) with reference to those shares of stock," and that he became the "absolute owner" thereof, "no strings." He further stated that he carried the stock on his books in the name of his wife as trustee for their three minor daughters. In his capacity as vice-president Anheuser signed the stock certificate issued to Steinberg under date of July 5, 1929, for the 625 shares which he had purchased from Fred Suhre. At that time Anheuser remarked to a Mr. Mills, secretary of the brewery, that he thought it was about the first time that any of the brewery stock had been in the hands of a "broker" as it had always been closely held in the family, "meaning the Anheuser and Busch families." It was in this way that Anheuser learned that Steinberg had acquired these shares. There is no direct evidence that Busch knew that Steinberg owned these shares, or that he was informed thereof, prior to the transaction between him and Anheuser, which Anheuser said occurred on February 12, 1930. Plaintiff claims that a reasonable inference based upon circumstantial evidence is deducible that Busch was advised that Steinberg owned this stock and that in purchasing it Anheuser was acting for Busch.

We come now to the negotiations between Steinberg and Anheuser culminating in the sale by Steinberg of the 625 shares of stock on January 22, 1930. No written memorandum of their agreement was made. No one heard their conversations, they were therefore the only witnesses as to what occurred, and there is a sharp and pronounced conflict in their testimony. Steinberg testified; that Anheuser "called at my office either the last week of 1929 or the first week in January, 1930, . . . . he said he came to see me about

purchasing 625 shares of Anheuser-Busch stock which I had and wanted to know whether I would sell it and what price I wanted for it and I told him that I was not interested in selling it; that I had considerable belief in the future of Anheuser-Busch and that I had turned the stock over to my three children and divided it amongst them; that I didn't want to sell it. He then went on to say that it was only an investment so far as I was concerned, but that it meant a lot to him; that he was an officer of the company and told me I could get another investment; but I told him that I didn't want to sell it . . . and he left . . . Mr. Anheuser came in again about the 17th or 18th of January (1930) . . . and he said, 'I am going to lay my cards on the table; . . . I came up to see you again about that Anheuser-Busch stock; I will tell you the real reason why I want to buy it; you know that was Lilly Anheuser's inheritance, and she should have never let it get away from her, and it is just a crime that she did this speculating in the market; they should never have risked that stock under any circumstances, and I want to see that Lilly gets that stock back, and the reason I want to buy it is, I want to take it up and keep it for her until such time as she can take it back or I can arrange someway so she can get it;' and I said under those circumstances I might sell it, so my answer to him was, 'I think you are putting me in a position where I can't very well refuse, and under those circumstances I guess there is nothing left for me to do but to agree to sell it to you.' Then he said, 'What price will you sell it to me at?' I said, 'there can be no discussion of price in a matter of this kind, because I don't really want to sell the stock, but if you want it for that particular purpose the only thing I can say is that any price that you say is all right with me; I should say a price that will let me out with interest on my money and perhaps a little commission . . . say sixty-four or sixty-five;' and he said, 'Would sixty-four be all right?' I said, 'Under the circumstances, perfectly all right.' . . . and he said, 'I will come in and get the stock in the next day or two;' . . . It may have been the next day—I remember the date was the 22nd of January,—that he came in and gave me a check for it and got the certificates and went out with them. That was the third occasion that he came in.'' Steinberg further testified, that ''Plaintiff's husband William O. Suhre had formerly worked for him for a number of years'' but was not ''connected with me at that time;'' that he ''had always liked Will Suhre who had always been straight forward . . . and when Mr. Anheuser came in first and wanted to buy this stock I was not the slightest bit interested in selling it . . . but when he told me this story about wanting to get it for Lilly and I thought she was his sister—I found out subsequently she was his

cousin—I felt that it was the honorable thing to do and that I could afford to do it." Steinberg also testified, that Anheuser at no time mentioned Busch's name and that he understood and thought that he was selling the stock to Anheuser. There is no dispute that January 22, 1930, was the date on which the sale by Steinberg to Anheuser was concluded, the payment of the purchase price made and the stock certificate delivered. Anheuser testified positively that he had never called upon Steinberg or discussed the purchase of this stock with him prior to January 22, 1930; that on that date he called upon Steinberg at his office for the first time shortly before eleven o'clock A. M. at which time they discussed the sale of the stock and arrived at an agreement, and that he returned about one o'clock in the afternoon of that day, delivered his check to Steinberg and received the endorsed stock certificate from him. The following excerpts from the testimony of Anheuser give his version of the transaction: "I stopped in at the office of Mark C. Steinberg in the morning, shortly before 11 o'clock, and inquired whether he wanted to sell the 625 shares of stock and at that visit I agreed to buy them; I went back the same day and paid for them; I had only two talks with him, both on the same day, namely, January 22, 1930. No one else was present. . . . At the first conversation I stopped in to see if he cared to sell his Anheuser-Busch stock, and he said he did not; . . . so I said I would be going along and getting back to the office, and then he said he would make me a price on the lot if I cared to buy the whole block of stock; that if I cared to buy the block he would sell it to me for $40,000.00. I asked him how much that was a share and he said he wasn't selling it by the share, so I took a piece of paper and figured it and it was $64.00 a share. I thought that was high and told him so; it seems to me I made him a lower offer, I think 60 but he said that $40,000.00 was his price for the block and after a few minutes I agreed to take it at that price. He said I could have it then but I told him . . . that I would return that day or the next with my personal check if he would instruct somebody in his office to deliver the stock to me. He introduced me to some gentleman and told him if I came in with my personal check for $40,000.00 he should deliver the stock to me properly endorsed. . . . Mr. Steinberg said that sometimes he turned stock over to his children and that he intended to do that with this block, but that if I cared to pay as much as $40,000 he would let me have it. Mr. Steinberg didn't tell me that he wasn't interested at all in selling the stock because he had turned it over to his children and that he thought it would prove a good investment in the long run; he said he wasn't interested in selling; that he sometimes turned stock over to his children, and he thought he would do that with

this stock. I next saw Mr. Steinberg the same day, having gone down to the brewery office in the interval. At the brewery I saw Mr. Bennett (assistant treasurer) and told him I had just agreed to purchase this stock for $40,000.00 and asked him if I could get the money from the firm, and told him if I couldn't I would get it at the bank. Mr. Bennett agreed to deliver the money and I told him I would put up the 625 shares as collateral together with some more brewery stock that I had. Mr. Bennett did not think that was necessary, but agreed to take the 625 shares as collateral and I gave him a demand note for that $40,000.00. I had the stock transferred and then turned it over to Mr. Bennett. I obtained two Anheuser-Busch checks from Mr. Bennett, deposited them in the First National Bank and then took a counter check and made it payable to Mark C. Steinberg; I then took it to Steinberg, , . . and he handed me the endorsed stock. On that occasion there was no other conversation. . . . In neither of my conversations with Mr. Steinberg did I say that I came to see him again about the Anheuser-Busch stock and was going to lay my cards on the table; nor that the reason I wanted to buy the stock was not on my own account but on account of Lilly Anheuser, meaning Lilly Suhre. We didn't discuss stock speculation and I did not tell him in either conversation that I wanted to buy the stock so that I could hold it until such time that Lilly Anheuser could reacquire it, either by purchase or some other method. I did not tell him that I would merely lay out the funds to purchase the stock and would give Mrs. Suhre an opportunity to repurchase it at any time she wanted; Mrs. Suhre's name was not brought up at all in my conversations with Mr. Steinberg.''

In the foregoing excerpts from his testimony, and also in other portions thereof, not here set out, Anheuser specifically denied all of Steinberg's statements relating to conversations between them concerning Mrs. Suhre, or her prior ownership of the stock, or that she had lost same in stock market speculation, and denied the alleged representations that he desired to purchase the stock in order to hold same for Mrs. Suhre until such time as she might both desire to purchase same and be in a financial position to do so. Steinberg testified, that ''at the time'' his firm held the stock as security for the ''Suhre account'' he contemplated that ''the brewery, itself—when I say 'the brewery' I mean Mr. Busch and family—would probably be the only people who would make a bid for the stock;'' that ''at the time'' he ''bought this stock from Fred Suhre'' he was of the opinion that the ''only place we could sell it was down at the brewery;'' that the brewery statement showed a good book value; and ''I believed that values would rehabilitate themselves. I won't attempt to say that I was so far-seeing as to feel sure at that time

(July, 1929) that beer was coming back, but I thought it (Anheuser-Busch, Inc.) was a strong organization . . . it was more a series of enterprises at that time than a brewery and it looked like they would keep on going at different things until they hit something that would be successful.''

It is pertinent here to refer to the evidence tending to show something of the value of the brewery stock at the time of the sale of these shares by Steinberg to Anheuser (January, 1930) and its subsequent enhancement in value. It will be remembered that plaintiff first asserted the claim she herein makes in June, 1934. The general auditor of the brewery testified from a statement showing the operating profits and losses of the brewery ''beginning with 1930 down to June 30, 1934,'' as follows; that ''in 1930 the operating loss was $705,658, for 1931 the loss was $765,289, in 1932 the loss was $639,-792, in 1933 (legalization of beer) there was an operating profit of $1,307,263, and the first six months of 1934 a profit of $938,281.'' He further testified that while ''during the years beginning with 1930'' the brewery ''paid cash dividends when there was an operating loss, the dividends were paid out of earnings prior to 1925 and out of surplus prior to 1913. It was the sale of capital assets that brought in the funds necessary for the operation of the Anheuser-Busch business, such assets as real-estate and holdings of subsidiary companies.'' The only sale of stock shown in 1929 was made to Busch on May 24, 1929, 418¾ shares at $50 and on June 18, 1929, 375 shares at $50 and the sale of the 265 shares by Fred Suhre to Steinberg July 5, 1929, at $60. The evidence shows the following as to subsequent years to and including 1934; that there were no sales of brewery stock in 1930; that in 1931 the stock was unlisted, not active, and the values ranged from $40 to $60; that in October, 1932, the stock became active and during October, November and December ranged from $115 to $150; that in 1933 the stock was ''the most active'' with sales ''practically every month'' at prices ranging from $105 to $210; and that in 1934 up to June 1, the range was from $105 to $140. It will be noted that the sales in 1929 were nearest to the time Anheuser purchased the 625 shares from Steinberg (January, 1930) and the highest 1929 price was $60 which Steinberg paid Fred Suhre in July, 1929. Approximately 7 months later Anheuser purchased the same shares from Steinberg at $64. Thereafter no sale is shown at a price in excess of $60 until October 1932, except that Anheuser states that feeling that he had paid too much for the stock, and desiring to take up the $40,000 demand note he had made to the brewery at the time of the purchase, he offered these 625 shares to Busch on February 12, 1930, at the price he had paid therefor. Busch purchased the stock from him at that price by as-

suming the Anheuser indebtedness to the brewery. We have set out the evidence bearing on the value of the stock rather fully as demonstrating that Steinberg asked and Anheuser paid full value—all, if not more than, the stock was, at that time, considered worth. As Steinberg stated, and as is common knowledge, the legalization of beer, which subsequently occurred (April, 1933) giving the stock a greatly increased value, was most uncertain and highly speculative in July, 1929, and January, 1930. During the period of approximately 7 months that Steinberg owned these 625 shares he received a cash dividend of $2.50 a share, a total of $1562.50. He sold to Anheuser at a price which was $4 per share more than he had paid Fred Suhre, a profit of $2500, so that upon his investment he had income and profit of $4062.50 within a period of 7 months.

As heretofore said there is no direct evidence whatsoever that Busch had any knowledge of the transaction prior to February 12, 1930. Anheuser testified, that on that date he informed Busch that he owned these shares, that he had purchased them from Steinberg, and that he borrowed the money from the brewery, upon a demand note, to make the purchase; that that was the first information Busch had of the matter; that he told Busch he would sell the stock to him at the same price at which he had purchased it plus accrued interest on the demand note; and that his reason for desiring to sell was that he felt that he had paid too much for the stock and wanted to liquidate the indebtedness to the brewery which he had incurred in making the purchase. According to Anheuser's testimony, Busch agreed to take over the stock at that price and assume Anheuser's indebtedness to the brewery and thereupon Busch executed his note to the brewery as of the same date of the Anheuser note, January 22, 1930 (bearing interest from that date), and the Busch note was substituted for that of Anheuser, whereupon Anheuser's note was returned to him. Bennett, the assistant treasurer, made out the Busch note and directed the subsequent procedure whereby Busch was substituted for Anheuser, as the borrower, on the brewery records. The method followed in making this substitution is the source of the major circumstances upon which plaintiff relies as tending to show that Busch was the real purchaser of the stock from Steinberg and that Anheuser was merely acting for him as his agent. It would be difficult to detail the manner by which it was shown upon the records of the brewery that Busch had assumed the Anheuser loan. An illustration is Bennett's cash voucher, seemingly the first memorandum or record in the loan to Anheuser, dated and issued on January 22, 1930, and originally written by him in the name of Anheuser. Bennett crossed out Anheuser's name in the cash voucher with an ink line and substituted for it the name of Busch and then

instructed the Treasury Department to make the same change in all the records of that department. The records in the Auditing Department are also involved. However, our conclusion as to this case obviates a detail statement of the circumstances upon which plaintiff relies in attempting to show that Busch was not a bona fide purchaser from Anheuser but was the real purchaser from Steinberg through Anheuser as his agent.

Steinberg testified, that about April 22, 1930, three months after he had sold the stock to Anheuser he "met Mr. Suhre (plaintiff's husband) in the lobby of Boatmen's Bank Building" and, in the course of their ensuing conversation, "told him what Mr. Anheuser had said during our negotiations and what I had said, just as I have testified to it here; I withheld none of the facts from Mr. Suhre. Everything that transpired between Fred Anheuser and myself . . . concerning these shares I repeated to Will Suhre;" that Suhre called on him the next day and they discussed the matter again; and that "at the second conversation Mr. Suhre said he had told his wife about our first conversation and they both appreciated what I had done." Steinberg said that he told Suhre he had sold the stock to Anheuser and that he did not mention Busch in connection with the transaction as he did not know, or have any reason to believe, that Busch was interested in the stock purchase. Thus according to plaintiff's principal witness, Steinberg, she was fully informed of the transaction between Steinberg and Anheuser as early as April, 1930. She knew Anheuser was a large stockholder in the brewery and a man of financial rating, abundantly able to respond at law in damages or in equity by furnishing similar shares of stock if she had suffered any injury or loss by reason of his purchase of the shares from Steinberg. But so far as appears from the record before us neither plaintiff or her husband, nor any one in her behalf, ever made any claim of right, option or interest in these shares of stock to either Anheuser or Busch, or asserted a claim of any kind, in respect thereto, until June 18, 1934, more than four years after plaintiff had full and complete information of the alleged transaction between Steinberg and Anheuser, and after the death of Busch. It will also be noted that in the meantime the manufacture and sale of beer had been made legal and the stock had doubled in value. We again note that tender and demand was not made until July 3, 1934. Such is the basis of defendants' claim of laches. Neither plaintiff nor her husband testified and so far as we discover plaintiff does not plead nor her proof specifically show any excuse or reason for the delay. In her reply brief reference is made to the abstract filed in this court in a former suit by this plaintiff against the same defendants as herein, Suhre v. Busch, 343 Mo. 170, 120 S. W. (2d) 47, and

it is said that it is "quite clear" from the testimony of plaintiff and her husband in that case that they "were occupied constantly until April, 1933, in their efforts to raise funds with which to redeem the shares of stock which were the subject matter of that suit," and that it is apparent that plaintiff was unable at any time earlier than the time of the tender made herein to obtain the funds required to purchase this stock and support a tender of the amount necessary.

Assuming, for the present purposes; that it sufficiently appears from the evidence, that plaintiff's delay did not so work to the prejudice, disadvantage or injury of defendants as to constitute laches on her part; and also that plaintiff has shown that Busch was the real purchaser from Steinberg through Anheuser as his authorized agent and therefore bound by an answerable for Anheuser's alleged fraudulent representations to Steinberg; and accepting Steinberg's testimony as to the transaction between Anheuser and himself as the true and correct version of their negotiations and resulting agreement, as if Steinberg's testimony were uncontradicted; we examine plaintiff's theory that a constructive trust arose in her favor and that the executors of Busch, deceased, hold 625 shares of brewery stock for her as constructive trustees. Though much of plaintiff's argument seems to indicate a reliance upon either an express oral trust or a contract for her benefit it should be borne in mind that plaintiff specifically disclaims both theories and asserts that she does not, by this suit, seek to establish and enforce an express trust nor to have specific performance of a contract for her benefit but relies upon the theory of a constructive trust *ex maleficio* as her sole ground of recovery. Before proceeding with a determination of whether, upon the facts as stated by Steinberg, a constructive trust arose in favor of plaintiff it may be helpful to here note that the evidence conclusively shows the following: (1) No confidential, fiduciary or business relationship of any kind whatsoever existed between Anheuser and Mrs. Suhre, nor does plaintiff so claim; (2) At the time Steinberg purchased the stock from Fred Suhre, brother of plaintiff's husband, plaintiff had no equity or interest in the stock and Steinberg became and was the absolute and unconditional owner thereof. Steinberg did not grant or promise plaintiff Mrs. Suhre an option or right or opportunity of any kind, enforceable or otherwise, to purchase the stock. She did not ask nor did Steinberg either offer, agree to, or contemplate any kind of option whereby she might purchase the stock from him. Nor did either Mrs. Suhre or Steinberg contemplate a gift of the stock to her by Steinberg or that Steinberg would himself hold it until such time as she might desire to purchase it from him and be in a financial position to do so. No confidential or fiduciary relation existed between Steinberg and Mrs. Suhre as to this stock after he became the absolute owner thereof. What we have

endeavored to emphasize is that when Steinberg owned the stock Mrs. Suhre had no legal or equitable title, option, interest or right, enforceable or otherwise, in the stock nor was she the beneficiary of any agreement, promise, trust or expectancy of any kind in reference to it and she therefore lost nothing nor was she deprived of anything by the sale of the stock which it is said Anheuser, by false representations, induced Steinberg to make. As we have pointed out Steinberg asked and Anheuser paid full value for the stock. Whether Steinberg would have a cause of action based on fraud and what remedy he would pursue is not pertinent here. The question for decision is whether in such a situation plaintiff's claim of a constructive trust, in her favor, can be sustained.

██ Constructive trusts do not, like express trusts and resulting trusts, "arise by virtue of agreement or intention, either actual or implied, but by operation of law, or, more accurately, by construction of the court, regardless" and independently of any actual or presumed intention of the parties to create a trust. [65 C. J., p. 454; 26 R. C. L., p. 1232.] It is said, "Fraud, either actual or constructive, is the very foundation" of constructive trusts "which are accordingly called, by those who delight in garnering expressions from the ripened fields of the classical languages, 'trusts ex maleficio!'" [Ferguson v. Robinson, 258 Mo. 113, 167 S. W. 447.] They are not technical trusts and in imposing or declaring a constructive trust a court of equity merely uses the machinery of a trust to prevent fraud or provide a remedy in cases of fraud, actual or constructive, by making the person who has wrongfully acquired property, or has acquired property under such circumstances as make it inequitable for him to retain it, a trustee for the person defrauded or injured by such fraudulent or wrongful conduct. [65 C. J., pp. 454, 455, 456; Restatement of the Law of Restitution (American Law Institute), pp. 641, 642, 643, 644; 26 R. C. L., p. 1232; Ferguson v. Robinson, supra; Thierry v. Thierry, 298 Mo. 25, 249 S. W. 946; Phillips v. Jackson, 240 Mo. 310, 144 S. W. 112; Miller v. Belville, 98 Vt. 243, 126 Atl. 590; Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 122 N. E. 378.] Upon even a cursory examination of the array of authority on the subject we think it will be found that a constructive trust is the method or formula used by a court of equity as a means of effecting restitution or of rectifying a situation where, as the result of the violation of confidence or faith reposed in another, or fraudulent act or conduct of such other, the plaintiff, who seeks the aid of equity, has been wrongfully deprived of, or has lost, some title, right, equity, interest, expectancy, or benefit, in the property which, otherwise and but for such fraudulent or wrongful act or conduct, he would have had. As indicating such

to be a characteristic of a constructive trust the subject is treated by the American Law Institute under the classification of Restitution, see Restatement of the Law of Restitution, Chapter 9, Equitable Remedies, section 160, page 640.

In most cases (and such seems to be a typical case of a constructive trust) the object and purpose of a court of equity in imposing a constructive trust is "to restore to plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in a position in which he was before the defendant acquired the property." Restatement of the Law of Restitution, page 643. Continuing, at the same citation, the Restatement says: "There are some situations, however, in which a constructive trust is imposed in favor of a plaintiff who has not suffered a loss or who has not suffered a loss as great as the benefit received by the defendant. In these situations the defendant is compelled to surrender the benefit on the ground that he would be unjustly enriched if he were permitted to retain it, even though that enrichment is not at the expense or wholly at the expense of the plaintiff. Thus, if the defendant has made a profit through the violation of a duty to the plaintiff to whom he is in a fiduciary relation, he can be compelled to surrender the profit to the plaintiff, although the profit was not made at the expense of the plaintiff. So also, where the defendant makes a profit through the consciously wrongful disposition of the plaintiff's property, he can be compelled to surrender the profit to the plaintiff and not merely to restore to the plaintiff his property or its value. So also, in certain cases where the defendant wrongfully prevents the plaintiff from acquiring property and acquires the property for himself, the defendant can be compelled to surrender the property to the plaintiff, and not merely to restore the property to the person from whom the defendant wrongfully acquired it."

Steinberg said he did not want to sell the stock but was induced to sell it to Anheuser (for an adequate consideration, the full market value and at a profit) by Anheuser's statements and representations relative to purchasing and holding same for Mrs. Suhre. Plaintiff's position is this, that Steinberg was induced to sell and part with the stock by fraudulent and false representations made by Anheuser whereby a fraud was perpetrated upon Steinberg and though Mrs. Suhre at the time had no interest, right, or expectancy of any kind whatsoever in, or in respect to, the stock and by the sale to Anheuser was not deprived of and did not lose anything which she would

otherwise have had, nevertheless, because of the fraud against Steinberg, a constructive trust arose in favor of Mrs. Suhre and Busch became a constructive trustee of the stock for her. Plaintiff cites numerous cases as sustaining her in this position but as we read these cases they are not adjudged upon facts similar to those in the instant case and for the most part come readily within classifications of constructive trusts heretofore mentioned and recognized. A full discussion of the cases separately would unduly prolong this opinion, however, we shall attempt to note the gist of the rulings therein made and so far as possible note the cases coming within a common classification.

It is well established that under the following circumstances a court of equity will impose a constructive trust in favor of the party deprived of property or an interest therein by the fraudulent conduct of the defendant: (1) Where a testator, in reliance upon a promise by a legatee that he will dispose of or apply property devised or bequeathed to him, or some part of it, for the benefit of another, in accordance with the direction or request of the testator, is induced to make a will or not to change one after it is made, but the promisor-legatee fails and refuses to comply with the direction of the testator as to such property, or part thereof, and seeks to retain the property as his own thereby depriving the person to whom the testator would otherwise, and but for the promise, have devised or conveyed it, of such property, a court of equity will by reason of his fraudulent conduct, decree the legatee to be a constructive trustee; likewise where the next of kin induce their relative not to make a deed or will ''by promising in case his property fall to them through intestacy,'' to dispose of or apply it, or some part of it, in the manner directed by him for the benefit of the person who would have been the grantee or devisee in the intended deed or will. [See Mead v. Robertson, 131 Mo. App. 185, 110 S. W. 1095, and Annotation 66 A. L. R. 156.] (2) Where there is a gratuitous conveyance of property in reliance on a promise or assurance by the grantee that he will convey, dispose of or apply the property in the particular manner indicated, directed or intended by the grantor but the grantee repudiates such promise and seeks to retain the property for his own use and benefit thereby depriving the person for whose benefit the conveyance was intended of the property, which otherwise and but for the fraudulent conduct of the grantee would have been directly conveyed or devised to him or applied for his benefit, equity will impose a constructive trust in favor of the party thus deprived of the property. A like rule applies where a person by his promise prevents the execution of a will or a gratuitous conveyance by deed in favor of another, to his own benefit, thereby depriving the intended devisee, legatee

or donee of the property. In the foregoing instances the person declared a constructive trustee is not permitted to unjustly profit or be enriched at the expense and to the loss of plaintiff and it will also be noted that plaintiff had an expectancy—that is that there was an intention and expectation on the part of the owner of the property to give it by devise or conveyance to plaintiff—which would have been defeated by the fraud of defendant had not equity interposed. As we analyse them the following cases cited by appellant are governed by the foregoing rules and come within either the first or second type of a constructive trust above noted. They are not, therefore, comparable authority in support of plaintiff's position in the instant case; Soehngen v. Jantzen (Mo. App.), 186 S. W. 1109; Janssen v. Christian (Mo. App.), 57 S. W. (2d) 692; Larmon v. Knight, 140 Ill. 232, 30 N. E. 318; Ahrens v. Jones, 169 N. Y. 555, 62 N. E. 666; Thomas v. Briggs, 98 Ind. App. 352, 189 N. E. 389; Fishbeck v. Gross, 112 Ill. 208; Johnston v. Reilly, 66 N. J. Eq., 451, 57 Atl. 1049. Fox v. Fox, 77 Neb. 601, 110 N. W. 304, is similar upon the facts to the situations above stated and, as we view that case, is ruled upon the same principles announced, supra, as governing the cases listed, therefore we classify it in this group.

We refer separately to the following other cases cited and relied upon by appellant. It is difficult to clearly and concisely state the facts in Miller v. Belville, 98 Vt. 243, 126 Atl. 590. The plaintiff was mortgagee in a mortgage on a tract of land. The mortgagor conveyed his interest in the land to defendant. Plaintiff, the mortgagee, and defendant then entered into an agreement whereby plaintiff was to release his mortgage and defendant was then to quitclaim the land to plaintiff whereupon plaintiff would reconvey a part only of the tract, by general warranty deed, to defendant who was to pay plaintiff an agreed price therefor in the form of notes secured by a mortgage on the part of the tract thus purchased from and conveyed by plaintiff. Pursuant to the agreement plaintiff ''discharged his . . . mortgage on the record, leaving thereby a clear record title'' to the whole tract in defendant who then refused to quitclaim to plaintiff, as he had agreed to do, or to comply with the agreement whereby plaintiff had been induced to release the mortgage. Thus by the fraudulent conduct of defendant plaintiff lost his mortgage and was deprived of his equity in the land. A court of equity imposed a constructive trust in favor of plaintiff. We do not deem the case an applicable authority in the present case. In Roller v. Spilmore, 13 Wis. 26, Michael Spilmore, in 1842, conveyed a certain tract of land to one Hagelmeyer, ''for a pretended consideration of $600, but really in trust for himself, and for the

sole purpose of preventing the property from being seized upon an execution against him . . . and with an understanding that Hagelmeyer was to reconvey the land to him. Hagelmeyer did not reconvey during the lifetime of Michael, and after the death of latter, in 1852, his widow, wishing to secure the land for their two infant children, requested the defendant Jacob Spilmore, who was a brother of Michael, to take charge of their interests, and he accordingly undertook to act as agent of said children, and as such to recover the land from Hagelmeyer for them. For that purpose he procured himself to be appointed administrator of the estate of Michael and as such administrator and as agent for said children, and for their sole use paid to Hagelmeyer the sum of $600 and obtained a conveyance" of the land from him. He took the deed in his own name "with the understanding that he took title as trustee for the infant children." The statement of facts in the opinion indicates that the $600 was paid out of the funds of the estate. Later he sold the land for $7600 out of which he paid the judgment but refused to account for the excess claiming that he was the owner of the land. It was held that he was a trustee of the property for the children. Apparently the children had an equitable interest in the property and also an interest in the $600 defendant paid "as administrator of the estate." Further the court pointed out that he obtained the property "in a fiduciary capacity." We have set out the facts rather fully as we think the dissimilarity with the facts of the instant case is such that the case cannot be taken as an authority for plaintiff's contention herein. It is difficult to determine the precise issue involved in Wright v. Gay, 101 Ill. 233, but the facts stated are; One Sims sold a tract of land "to R. H. Wasson, trustee for Mrs. Wright . . . taking notes for the purchase money, and giving a written contract to convey on payment of the purchase money." Mrs. Wright and her husband with, their children, went into possession of the land, lived on it, and made improvements; "default having been made in the full payment of the purchase money, one Troutman, to whom Sims had assigned said note and contract, filed a bill in chancery to subject the land to the payment of the notes, and a decree was rendered for the sale of the land for that purpose." Prior to the sale the three brothers of Mrs. Wright, John T., James R., and William D., Gay, entered into an agreement with Troutman and Wasson, the trustee for Mrs. Wright, that the Gays would purchase the land for the benefit of the Wright children. Apparently the three Gays contributed equally to a fund for that purpose and William D. was sent to make the purchase for the benefit of the Wright children and it was agreed that he should take the title in his own name "for the

security of the money'' to the three Gay brothers. ''The title was taken in his . . . name, because he was a single man and was not made to the Wrights because,'' as testified to by James R. Gay, ''we wanted to secure the money we put in it.'' The facts at this point are vague but we infer that William D. Gay died with the title to the land in his name and that his heirs claimed absolute ownership of the property. The opinion says that the evidence shows ''that the deed to William D. Gay, though absolute in form, was but a security to secure the Gays the repayment of the money which they had advanced;'' that ''it would, . . . be a fraud upon the other two brothers, as well as others, for William D. Gay, or his heirs under him to claim to hold the property as his own.'' It would appear that the Wright children through their mother, who had an equitable interest therein, had some kind of expectancy in respect to this land. The three brothers contributed to a common fund to make the purchase and by agreement and arrangement of all the parties Troutman, Wasson, trustee, for Mrs. Wright, and the three brothers, William D. Gay was authorized to and did act as a mere agent for and on behalf of the brothers, Mrs. Wright, their sister, and her children, in making the purchase and taking title in his name. We do not consider the case as an applicable authority upon the facts of the instant case, however, if it can be said that such points of similarity do exist as to make it an authority for plaintiff herein, we are not inclined to view the case as being of such persuasive weight as to alter our view of the application of a constructive trust heretofore indicated. Before closing the review of cases cited we think it meet to refer to one case cited by defendants (respondents) which seems somewhat akin to the present case. We refer to Garvey v. Jarvis, 46 N. Y. 310. In that case, ''one Malcolm held a judgment against the plaintiff for $2000, and had told the plaintiff that he would discharge it for $500, but the plaintiff had not accepted the offer; . . . the defendant (who was a stranger to the plaintiff), having learned of the willingness of Malcolm to discharge the judgment for that sum, applied to him, and by the false representation, that he came from and was a friend of the plaintiff, induced Malcolm to assign the judgment to him for $500.'' The plaintiff claimed ''the benefit of the purchase'' and contended, ''that the defendant held the judgment as trustee for him; that Malcolm assigned it believing that it was for the plaintiff; that the defendant procured it by a fraud;'' and that ''a trust *ex maleficio*'' arose in his favor. The opinion says: ''The most that can be claimed is that the defendant said he was acting for the plaintiff, which was false. He paid his own money, and in fact, acted for himself. He was a stranger to the plaintiff, and of course, under no obligation

to act for him, and as we have seen, he deprived the plaintiff of nothing to which he was entitled. . . . It is undoubtedly true, that an officious intermeddler with the rights and property of another, will not be allowed to reap any advantage to himself in dealing with the property of another but will be held to account in respect to it as a trustee. . . . In this case nothing was obtained to which the plaintiff had any legal right. He was, at most, only prevented from obtaining the voluntary clemency of his creditor, an interest too unsubstantial for judicial protection. The defendant committed a fraud, but it was a fraud upon Malcolm, and not upon the plaintiff, and this is the difficulty with the plaintiff's case. It is said that Malcolm put the judgment in the defendant's hands for the plaintiff, and that the plaintiff had the legal right to accept and receive it. True Malcolm was willing to accept $500 from the plaintiff for the judgment, and in assigning it, he supposed he was doing it for the benefit of the plaintiff; but such was not the fact. The assignment was, in fact, received for the benefit of the defendant and induced by his fraud. . . . Malcolm was the injured party. . . . As to the plaintiff, there was neither fraud nor damage both of which are indispensable to the maintenance of the action.''

■ Again we observe, by way of reminder; that no fiduciary relation existed between plaintiff and Anheuser or Busch; that Anheuser was not under any obligation to purchase the stock for plaintiff; and that plaintiff claims no right or interest in the shares of stock by virtue either of an express oral trust or an oral contract for her benefit but bases her claim wholly and solely upon the theory of a constructive trust, that is, that Anheuser by false representations induced Steinberg to sell the shares of stock to him and thereupon, because of such fraud, a constructive trust arose in her favor. Plaintiff lost nothing whatsoever, nor was she deprived of anything, by the fraud thus perpetrated upon Steinberg, nor did Anheuser or Busch thereby profit or gain at plaintiff's expense or to her loss. The fraud shown, by Steinberg's testimony, was against him, and not against plaintiff, and he alone sustained the loss or damage, if any, thereby occasioned. As we have said, whether he has a cause of action, and if so the nature thereof, is not for investigation or determination in this case. As we view the case, accepting Steinberg's version of the transaction between Anheuser and himself, a situation is not made out to which a constructive trust in plaintiff's favor is applicable, and therefore we concur in the finding of the trial chancellor that "there is no trust *ex maleficio*" in plaintiff's favor.

■ Another consideration which impels an affirmance of the judgment of the circuit court is the burden of proof that the law imposes

upon a plaintiff in a suit, of this kind, to establish an implied trust, proof of which rests in parol. "It is well settled that to establish an implied trust, whether it be a resulting or a constructive trust, 'an extraordinary degree of proof is required.'" [Norton v. Norton, (Mo.), 43 S. W. (2d) 1024.] A preponderance of the evidence is not sufficient; the evidence must be so "unquestionable in its character," clear, cogent and convincing "as to exclude every reasonable doubt from the chancellor's mind." [Norton v. Norton, supra; Bunel v. Nester, 203 Mo. 429, 101 S. W. 69; La Rue v. La Rue, 317 Mo. 207, 294 S. W. 723; Gaugh v. Gaugh, 321 Mo. 414, 11 S. W. (2d) 729; Ferguson v. Robinson, supra; In re Title Guaranty Trust Co. (Mo. App.), 113 S. W. (2d) 1053.] In our ruling, supra, disregarding the evidence to the contrary, we accepted Steinberg's testimony, relative to the negotiations resulting in the sale of the stock, as if it stood alone and uncontradicted; but, if plaintiff's theory, that upon the state of facts to which Steinberg testified a constructive trust would arise in her favor, be granted, then we have the question; whether plaintiff has met the burden of proof imposed in this kind of a case, which involves the credibility of the witnesses and the weight of the evidence. We have set out at length the contradictory testimony of Steinberg and Anheuser. It is obvious that if Anheuser's testimony be accorded credence Steinberg's testimony must be rejected and vice versa. There is little in the record tending to corroborate or support either as to the negotiations, the controlling fact issue upon which plaintiff's constructive trust theory stands or fails. Plaintiff marshals inferences and arguments as tending to show the Steinberg version to be the more probable but defendants counter with inferences and reasons equally cogent as to why Anheuser's version is the more probable. Apparently (as appears from the memorandum herein) the trial court found for defendants on the ground that upon Steinberg's testimony a constructive trust was not made out, laches, and the weight, quality and sufficiency of the evidence. Here is sharply conflicting and contradictory oral testimony upon a vital and crucial point of fact, the determination of which is wholly a matter of the credibility of the witnesses. While the whole record must come here for review in equity cases so that we may weigh and decide the case *de novo*, nevertheless, where a determinative issue of fact rests, as in this instance, wholly upon the credibility of witnesses, this court is constrained to defer to the findings of the chancellor "who has many opportunities, necessarily denied to the appellate court of seeing and hearing the witnesses themselves, observing their demeanor while testifying, and of determining the weight which properly attaches to their testimony." [Finley v. Williams, 325 Mo. 688, 29 S. W.

(2d) 103; Norton v. Norton, supra; Creamer v. Bivert, 214 Mo. 473, 113 S. W. 1118; Shaw v. Butler (Mo.), 78 S. W. (2d) 420; Stubblefield v. Husband, 341 Mo. 38, 106 S. W. (2d) 419.]

The judgment of the circuit court is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.