Josephine Adams MURPHY, Plaintiff–Appellant,

v.

Roland K. MIDDLETON and Mary Beth Middleton, Defendants– Respondents.

No. 28635.

Missouri Court of Appeals, Southern District, Division Two.

June 10, 2008.

Christina L. Kime, Piedmont, for Appellant.

Jennifer Hackworth Thompson, L. Dwayne Hackworth, Piedmont, for Respondents.

NANCY STEFFEN RAHMEYER, Judge.

Josephine Adams Murphy ("Mother") is the mother of Mary Beth Middleton ("Daughter"). Mother brought a suit for a constructive trust against Daughter and Roland K. Middleton (collectively, "Respondents"), when they refused to allow Mother to reside in the home on the 135–acre farm ("the property") which Mother conveyed to Respondents by general warranty deed ("Warranty Deed") in 1993. After Mother presented her evidence at trial and the court reviewed the deposition of Daughter, the trial court purportedly granted summary judgment to Respondents. It is from this grant of summary judgment that Mother brings this appeal.

Mother brings four points on appeal, two challenging the "grant of summary judgment" on the merits, the third positing error for the failure of the court to comply with Missouri Supreme Court Rule 74.04,[1] and the last claiming that the trial court should have granted a new trial to hear new evidence. For ease of discussion, we shall address the allegations of procedural error first.

Mother filed suit in the Iron County Circuit Court on August 31, 2005. In her amended petition, she asked the court to declare that Respondents held the property in a constructive trust for Mother and require them to re-convey the property to Mother. After Mother rested her case and before Respondents submitted any evidence, counsel for Respondents asked the court to dismiss the case based on the evidence presented by Mother. Before ruling on Respondents' oral motion, the

---

1. All rule references are to Missouri Court Rules (2007), unless otherwise specified.

court took a recess to review the deposition of Daughter, which had been previously filed with the court by Respondents. When the trial resumed, the following exchange took place:

> Court: I've actually read the deposition of [Daughter]. [Respondents' Counsel] is your motion a motion to dismiss or a motion for summary judgment?
>
> [Respondents' Counsel]: Well either one will solve what I planned to accomplish. I do not believe [Mother has] proved the elements that [she] set forth in [her] petition, so it could be a motion to dismiss for lack of proof on the petition or it could be a motion for summary judgment based upon the testimony of [Mother] herself. I believe [Mother's] testimony without any other evidence being offered is insufficient to meet the allegation in [Mother's] petition. I think her own testimony did not come close to meeting the elements of a constructive trust, in addition to not agreeing to the facts as pled in the petition.

The trial court then announced on the record its findings in favor of Respondents. These findings were incorporated into a formal judgment dated May 29, 2007. In the court's judgment, the trial judge refers to Respondents' *oral* request for summary judgment and determines "that as a Matter of Law, it is bound and required to summarily give Judgment to [Respondents]."

Rule 74.04(c) provides [2]:

(c) Motions and Proceedings Thereon.

(1) *Motions for Summary Judgment.* A motion for summary judgment shall summarily state the legal basis for the motion.

A statement of uncontroverted material facts shall be attached to the motion.

The statement shall state with particularity in separately numbered paragraphs each material fact as to which movant claims there is no genuine issue, with specific references to the pleadings, discovery, exhibits or affidavits that demonstrate the lack of a genuine issue as to such facts.

Attached to the statement shall be a copy of all discovery, exhibits or affidavits on which the motion relies.

Movant shall file a separate legal memorandum explaining why summary judgment should be granted.

Rule 74.04(c)(1) (The rule also provides the process and timing for a response to the summary judgment motion as well as an opportunity to reply to the response.).

(6) *Rulings on Motions for Summary Judgment.* After the response, reply and any sur-reply have been filed or the deadlines therefor have expired, the court shall decide the motion.

Rule 74.04(c)(6).

■ The terms of Rule 74.04(c) are mandatory and failure to comply requires reversal. *Morley v. Henske*, 704 S.W.2d 298, 299 (Mo.App. E.D.1986). Here, clearly, none of the requirements of Rule 74.04(c) were complied with. Respondents did not submit a written motion for summary judgment with any undisputed facts, stated in particularity in numbered paragraphs, and filed no pleadings, discovery, exhibits, or affidavits demonstrating a lack of a genuine issue as to such facts. Mother was not given notice or time to respond. Despite the failure to comply with Rule 74.04(c), Respondents claim the trial court did not err in granting Respondents' oral motion to dismiss because Respondents requested, at the close of Mother's case, a dismissal, which was actually treated by

---

**2.** This text of subdivision (c) is effective until July 1, 2008.

the trial court as a motion to dismiss under Rule 73.01(b); therefore, the correct result was achieved, the only error being technical in what the court termed the dismissal, and the judgment should be affirmed or, in the alternative, remanded for a full adjudication on the issues.

After a plaintiff has completed the presentation of his case, the defendant can move for a judgment on the grounds that, based on the facts and the law, the plaintiff is not entitled to relief. Rule 73.01(b). A plaintiff who has put on his own case and has failed to convince the judge, as the trier of fact, of a right to relief, has no legal right to compel the court to hear the defendant's case. *Wyrozynski v. Nichols*, 752 S.W.2d 433, 435 (Mo.App. E.D.1988). When the defendant makes such a motion to dismiss at the end of a plaintiff's case, the trial court must consider the record, determine the credibility of the plaintiff's witnesses, weigh the evidence, and make appropriate findings of fact and conclusions of law in support of the judgment it reaches. *Id.* at 436–37. We find that regardless of how Respondents designated the motion and how the court indicated it was making its ruling, the result was a judgment on the merits under Rule 73.01(b).

Initially, we note that Respondents actually moved to dismiss the case based on the evidence presented. It was the court that indicated it was a summary judgment. More importantly, the court's ruling was made at the end of Mother's case and after the parties stipulated that the court should review a deposition of Daughter. The trial court noted in its judgment that Mother "orally offers and the Court receives into evidence the original evidentiary deposition transcript for the deposition of [Daughter]." In a court-tried case, a motion for directed verdict submits the issue for a decision on the merits and, therefore, the court of appeals considers such a motion to be a motion for a judgment pursuant to Rule 73.01(b) that allows a defendant at the close of plaintiff's evidence to move for a judgment on the grounds that upon the facts and the law the plaintiff is not entitled to relief; thus, the court of appeals will review the case on its merits. *Nautilus Ins. Co. v. I–70 Used Cars, Inc.*, 154 S.W.3d 521, 527 (Mo.App. W.D.2005); *Keefhaver v. Kimbrell*, 58 S.W.3d 54, 58 (Mo.App. W.D.2001).

In a judge-tried case, where a party against whom a motion for directed verdict has the burden of persuasion, the motion is treated as a motion to dismiss and submits on the merits the issues on which appellants have the burden of persuasion, requiring the trial court to determine credibility of the witnesses and to weigh the evidence, so that the appeal from the ruling on the motion is from a final determination of the issues in question and is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Colombo v. Buford*, 935 S.W.2d 690, 694 (Mo.App. W.D.1996) (internal citations omitted). The court made its ruling based upon the evidence that it heard and ruled under the facts and the law that Mother had not made her case. Point III is denied.

We next turn to Mother's first point, that the trial court erred in finding on the merits that there was no constructive trust. Specifically, Mother contends she had transferred the property upon the "promise from [Daughter] that [Mother] would be allowed to live on and control the farm property until her death." Although Mother contends that we review the denial of the constructive trust as *de novo* because it was a grant of summary judgment, as noted in Point III, the determination was actually a finding on the facts and the law that Mother was not entitled to

relief. *Keefhaver*, 58 S.W.3d at 58. In reviewing the judgment, an appellate court views the evidence and reasonable inferences therefrom in the light most favorable to the judgment disregarding all contrary evidence. *Colombo*, 935 S.W.2d at 694. The judgment of the trial court will be affirmed "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Brown v. Brown*, 152 S.W.3d 911, 913 (Mo.App. W.D.2005) (*quoting Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). The appellate court will defer to the trial court's credibility determinations because it was in a better position to judge the credibility of witnesses. *Id.* at 913–14. With this standard of review in mind, we shall review the evidence produced at the trial.

Delmar Adams and his mother, Marjorie Adams, acquired the property on November 9, 1962; Mother and Delmar Adams married in 1967; and on December 26, 1975, Delmar and Mother became the titled owners of the property. In 1982, after Delmar Adams retired, Delmar and Mother built a home on the property. It is this home which is the subject of this dispute.

On September 25, 1990, Delmar and Mother executed a beneficiary deed to the property to Daughter so that the property would be owned by Daughter after both of their deaths. Delmar Adams died on February 5, 1991. After the death of Delmar Adams, Mother and Respondents continued the farming partnership previously shared by Delmar and Marjorie Adams.[3] The proceeds of any cattle sold were split in half between Mother and Respondents.

The cattle were located on part of the property and on another part of adjoining property that was owned by Marjorie Adams. Mother testified that she and Respondents never filed a partnership tax return with regards to the cattle. After about a year, Mother gave the farming operation, including farm equipment and cattle, to Respondents. No consideration was paid for this transfer.

Mother and Daughter previously had a close relationship. Mother executed a Durable Power of Attorney on October 1, 1992, appointing Daughter her attorney-in-fact, though Daughter never used that Power of Attorney to transact any business for Mother. Mother took care of her own affairs, including all of her financial affairs, going to the grocery store and going to doctor appointments without any assistance from Daughter. Mother was employed at an established business as their only bookkeeper; she was healthy and not on any medication, with her only health problem not occurring until the year 2000, seven years after the execution of the Warranty Deed. Mother made the decision and all of the necessary arrangements to revoke the Power of Attorney appointing Daughter as her attorney-in-fact some time before or after executing the Warranty Deed without any advice or any discussion of said revocation whatsoever with Daughter.

On February 16, 1993, Mother conveyed to Respondents the property at issue, which included a house situated thereon. Mother testified that she and Daughter had discussed conveying the property to Daughter "then there wouldn't be any probate court or anything for her to have to go through upon [Mother's] death." They

**3.** At some point prior to Delmar Adams' death, Respondents purchased Marjorie Adams' half of the cattle.

discussed that there would not be any "inheritance tax." Mother testified that she had forgotten about the beneficiary deed previously signed by her and her husband. She also testified that she and Daughter agreed that she was to live on the property as long as she lived with no restrictions. At the time she signed the Warranty Deed, Mother asked Daughter what would happen if something happened to Daughter, would Daughter's husband "put me out on the street." Mother testified that Daughter assured her at that time, "Oh Mother you know that he would never do that."

The Warranty Deed was executed after Mother came to Respondents and told them "she was going to sign the property over" to them. Mother testified that she wanted Daughter to have the property for the reason that said property once belonged to Daughter's father and grandmother. Mother testified that she deeded the property to Respondents as a gift, intended it to be a gift, and told Daughter to consider it a last gift from her dad.

Mother also testified that she does not want to farm the property now and that she did not want to farm the property when she deeded it to Respondents and that Respondents did not promise her anything for deeding them the property. She stated that she gave Daughter the property because she "is our only child and I wanted to be sure that she had the place." Mother testified that there was a discussion between her and Daughter that the Warranty Deed would avoid probate upon Mother's death. Mother testified that Daughter did not tell her that she would have a life estate on the property. Mother further testified that both she and Daughter, together, made the arrangements for the preparation of the Warranty Deed. The Warranty Deed contained no restric-

tions or reservations therein, and no other writings exist concerning this transaction.

In June 1994, shortly after the Warranty Deed was executed conveying them the property, Respondents purchased the adjacent property, where they have since resided. After the Warranty Deed was executed conveying to them the property, Respondents have paid the property taxes and all of the insurance regarding said property each and every year; Respondents have made improvements to the property with their separate money, including liming and fertilizing the property, building fences on the property and adding on to the barn located on the property. Mother testified that from the time the property was deeded to Respondents, twelve years before she filed this suit, she absolutely consented to Respondents acting as though they owned and controlled said property like it was their own.

Daughter testified by way of deposition that she did not believe she could evict Mother after receiving the Warranty Deed; she testified that it was her understanding Mother would continue to live on the property as long as she lived. Daughter testified in her deposition that whether Mother would live on the property for her lifetime was not discussed, but that she wanted Mother to continue to live on the property. Mother did continue to live in and maintain the home on the property until 2005. Mother paid for repairs to the air conditioning and a pump in the well. On September 20, 2000, Mother married James Murphy. The marriage took place at the Jefferson City Correctional Center where Mr. Murphy was incarcerated. Mother did not tell Daughter about the marriage.

For some time after the marriage, while Mr. Murphy remained incarcerated, Mother's life did not change much as she continued to live on the farm. Daughter learned

of the marriage about a year and a half after it occurred through a friend who worked in a prison fellowship program with Mother. In 2004, approximately one year before Mr. Murphy was released from prison, Mother found out that Daughter had learned of her marriage. Daughter asked Mother to divorce Mr. Murphy and she refused. Daughter communicated with Mr. Murphy's parole officer on a number of occasions. Daughter advised Mr. Murphy's parole officer that she objected to him moving onto the property with Mother after his release because of her fear for the safety of herself and her family. Daughter also told Mother that Mr. Murphy could not live on the property.

In 2004, Respondents told Mother they did not want her husband, a man twenty-five years younger than Mother, out on parole after serving twenty years in prison for twenty criminal convictions, including ten for armed criminal action, to live on the property located adjacent to Respondents' home, which they share with their young daughters, out of fear for the safety of their family. On September 2, 2005, Respondents sent a notice of termination of tenancy to Mother at her place of employment instructing her to remove her personal property from the premises and deliver possession to them by October 31, 2005.[4] Mother moved from the property and she and her husband live in a rented home in Piedmont. Despite the notice of termination, Mother testified that Respondents have not told her that she could no longer live on the property and that Respondents have actually told her she could still live on the property and Daughter testified that Mother can still live on the property.

We begin with a review of the law concerning constructive trusts.

Varied and confusing definitions of a constructive trust exist, as well as uncertainty regarding the constituent elements thereof. *Swon v. Huddleston*, 282 S.W.2d 18, 25 (Mo.1955); *Estate of Gulat*, 748 S.W.2d 79, 81 (Mo.App.1988). Although not technically a trust, a "constructive trust" is merely the machinery a court of equity uses as a remedy to right a past wrong. *March v. Gerstenschlager*, 436 S.W.2d 6, 8[2] (Mo.1969); *Lim v. Chong*, 66 S.W.3d 97, 100–01 (Mo.App.2001).

It has been stated that the constructive trust is the device used by chancery to force one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. *Wier v. Kansas City*, 356 Mo. 882, 204 S.W.2d 268, 270[1] (1947). It is a "method by which a court exercises its equitable powers to 'remedy a situation where a party has been wrongfully deprived of some right, title, benefit or interest in property as a result of fraud or in violation of confidence or faith reposed in another.'" *Fix v. Fix*, 847 S.W.2d 762, 765[4] (Mo.banc 1993) (quoting *Schultz v. Schultz*, 637 S.W.2d 1, 4 (Mo.banc 1982)).

In many typical cases, a court of equity uses the constructive trust remedy to restore to the plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him or her would result in a corresponding unjust enrichment of the defendant. *Suhre v. Busch*, 343 Mo. 679, 123 S.W.2d 8, 15–17[4] (1938); GEORGE GLEASON BOGERT GEORGE TAYLOR BOGERT, BO-

---

**4.** Mother's fourth point claims the evidence should have been reopened to admit the actu-al notice of termination of the tenancy.

GERT ON TRUSTS 471 (2d ed. 1978); 1 DAN B. DOBBS, LAW OF REMEDIES, ch. 4 § 4.3(2) (2d ed. 1993); 89 C.J.S. *Trusts* 139 (1992); RESTATEMENT OF RESTITUTION 160 at 640–45 (1937).

*Nelson v. Emmert*, 105 S.W.3d 563, 564–65 (Mo.App. S.D.2003).

 Mother claims a constructive trust should be granted because she shared a confidential relationship with Daughter at the time of the transfer of the property to Respondents and agreed at the time of the transfer that Mother would continue to live on the property with no restrictions until her death. "A confidential relationship cannot be precisely defined. It is generally synonymous with a fiduciary relationship." *Harlan v. Bishoff*, 649 S.W.2d 230, 233 (Mo.App. W.D.1983). While a family relationship alone is not sufficient to constitute a confidential relationship, "[a] confidential relationship may exist because of a family relationship, the transferor justified in placing confidence in the belief that the transferee will act in his best interest." *Id.*

 While it can be argued that Mother and Daughter were in a confidential relationship where Daughter would or should have had a fiduciary relationship with Mother, the problem with Mother's argument is the second part of Mother's contentions, her claim that there was a promise or agreement that Mother could reside in the house on the property until her death. Conflicting evidence was presented whether there was any promise, understanding, or representation that Mother could remain in the home on the property with no restrictions. Certainly, at the time of the transfer, there was no evidence that either of the parties anticipated any situation where Mother would be evicted from the property, but that does not necessarily rise to the claim of a "promise" such that equity should intervene to enter a constructive trust on the property, which includes the house, to allow Mother to remain on the property.

In the light most favorable to the judgment and disregarding any contrary evidence, Mother executed a Warranty Deed granting the property to Respondents; when she did so, she said it was a gift and told Daughter to consider it a last gift from her dad. Mother made that decision to sign the Warranty Deed to Respondents after discussions between them. Neither Mother nor Daughter recalled asking any questions of the attorney prior to the transfer.

The court was free to disregard Mother's testimony that she sought and received Daughter's assurance that Daughter's husband would not put Mother out on the street. Even though Daughter acknowledged that she did not believe she could evict Mother after receiving the Warranty Deed and it was her understanding Mother would continue to live on the property as long as she lived, the court also heard Mother's testimony that she did not want to farm the property at the time of the trial and that she did not want to farm the property when she deeded it to Respondents. Mother further testified that Daughter did not tell her that she would have a life estate in the property, that Respondents did not promise her anything for deeding them the property and that she gave Daughter the property because she "is our only child and I wanted to be sure that she had the place." The Warranty Deed contained no restrictions or reservations therein, and no other writings exist concerning this transaction. Mother's own testimony, therefore, contradicts any claim that there was an agreement in exchange for the property.

While there was certainly evidence from which the trial court could have found that

there was a constructive trust, substantial evidence supports the judgment, it is not against the weight of the evidence nor does it misapply the law. The credibility of the parties was for the trial court's determination. The trial court was free to accept the testimony that the transfer of the property in 1992 was a gift from Mother to Daughter. While the parties may have anticipated that they would maintain the friendly and close relationship that they did in 1992, the fact remains that the trial court found that Mother gave Daughter the property free and clear of any life estate or restrictions in use. While it is regrettable that the family relationship has deteriorated to such a degree that although Mother gave her rights to most of her substantial assets to Daughter and Daughter evicted Mother from the property, there is no trial court error in the denial of Mother's suit for a constructive trust to the property. Point I is denied.

Likewise, Mother's second point must fail for the same reason. In her second point, Mother contends that under the Restatement of Restitution § 182, Mother proved that she transferred the property upon an oral trust or agreement that she would be allowed to live on and control the property until her death and that the transfer was made as a result of a "mistake of such a character that [Mother] is entitled to restitution to prevent the unjust enrichment of Respondents." In support of her claim, Mother cites to the Restatement of Restitution § 182, which provides in pertinent part:

> Where the owner of an interest in land transfers it inter vivos to another upon an oral trust in favor of the transferor or upon an oral agreement to reconvey the land to the transferor, and the trust or agreement is unenforceable because of the Statute of Frauds, and the transferee refuses to perform the trust or agree-

ment, he holds the interest upon a constructive trust for the transferor, if

> (a) the transfer was procured by ... mistake of such a character that the transferor is entitled to restitution.

Restatement (First) of Restitution § 182 (1937).

■■■ Mother claims that she was mistaken in the execution of the Warranty Deed because she thought she would be allowed to live on the property in an unrestricted manner until her death. The initial problem with Mother's argument is that the trial court found there was no agreement or oral trust that Mother be allowed to live on the property "in an unrestricted manner" or any other manner. If there was no promise or oral agreement, then Mother cannot recover under the Restatement of Restitution § 182. The trial court did not find that Mother transferred the property by a mistake of such character that the transferor was entitled to restitution. Furthermore, the trial court found Respondents "have in no way been unjustly enriched. [Respondents] were enriched when the [Warranty Deed] was executed by [Mother] conveying to [Respondents] the property that is the subject of this suit, however, [Respondents] do not hold or retain any real property which in justice and equity would rightfully belong to [Mother]." Substantial evidence supports the trial court's findings.

Mother testified at trial that Respondents did not promise her anything for deeding them the property, and she stated that she gave them the property because Daughter "is our only child and I wanted to be sure that she had the place." Mother further testified that Respondents did not tell her she would have a life estate in the property. Daughter testified that Mother came to her and said she was signing the property to her and her hus-

band, Roland Middleton. Although Daughter wanted Mother to continue to live on the property, whether Mother would in fact live there for her lifetime was not discussed. Mother deeded her own property to her own daughter, with whom she had a close relationship, and is not entitled to restitution for that property. Point II is denied.

Finally, Mother contends in Point IV that the trial court erred in not reopening the evidence to allow the introduction of the written eviction notice from Respondents, which would have countered Respondents' claim that Mother could continue to live on the property and would have shown that there was a breach of the promise that Mother could reside on the property in an unrestricted fashion through her lifetime. Mother claims the eviction notice impeaches Daughter's testimony that Mother was still free to live in the house on the property. There is no need to belabor this point. It is clear from our earlier analysis that the trial court found there was no promise; therefore, any claimed breach is irrelevant. Point IV is denied.

The judgment is affirmed.

LYNCH, C.J., and BURRELL, J., concur.